**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Thelma Jean JONES; Bobby Lee**
**Penny, Defendants-Appellees.**

No. 86–5142.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1987.

Decided May 19, 1987.

Dean Robert Davis, Wilmington, N.C., for defendant-appellee Penny.

J.H. Corpening, II, Wilmington, N.C., for defendant-appellee Jones.

Before HALL and SPROUSE, Circuit Judges, and TIMBERS, Senior Circuit Judge for the Second Circuit, Sitting by Designation.

TIMBERS, Senior Circuit Judge.

The United States ("government") appeals from an order entered September 15, 1986 in the Eastern District of North Carolina, W. Earl Britt, *Chief District Judge,* granting the motions of Thelma Jean Jones and Bobby Lee Penny ("Jones" and "Penny" or, jointly, "appellees") to suppress certain statements made by them to two agents of the United States Secret Service ("the agents"). The court held that, when Jones and Penny were interrogated, they were "in custody" for purposes of the prophylactic rule of *Miranda v. Arizona,* 384 U.S. 436 (1966). Since no *Miranda* warnings had been given prior to what the court held was custodial interrogation, appellees' confessions were ordered suppressed.

On appeal, the government argues that *Miranda* warnings were not required because the agents specifically had advised appellees that they were not under arrest and the decision to submit to questioning by the agents, and to accompany them to police headquarters, was made by appellees of their own volition. Under such circumstances, the government argues that the rule of *Miranda* is not implicated.

We hold that appellees were neither taken into custody nor otherwise deprived of their freedom of action in any significant way. Consequently, appellees' statements are admissible against them.

We reverse.

## I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.

On May 6, 1986 Agents Rodriguez and Greenwood went to the Western Sizzlin

Thomas Ernest Booth, Dept. of Justice (Samuel T. Currin, U.S. Atty., Kieran Shanahan, Asst. U.S. Atty., Raleigh, N.C., on brief), for plaintiff-appellant.

Steak House in Southport, North Carolina, seeking Jones and Penny, who were both employed at the establishment. The agents were investigating the possible involvement of the couple in the passing of counterfeit money.

Upon the arrival of the agents at the restaurant, Penny fled from the area. The agents then approached Jones, identified themselves, advised her that her name had surfaced in their investigation, and asked if she would accompany them to the Southport Police Station to discuss the matter. Agent Greenwood told her that she was not under arrest.

Jones expressed concern that her absence from work would cause her to be docked pay, stating that she had been employed at the steakhouse for only three weeks. In an effort to alleviate her concern, the agents spoke to her supervisor and informed him that they needed to talk with Jones and that they anticipated she would be gone from her place of employment for approximately one hour. Since it was noon time, the agents informed the supervisor that the interview would take place during Jones' lunch break. The supervisor agreed not to dock Jones for the hour that she was away. Jones then accompanied the agents in their car to the Southport Police Station.

Upon arriving at the police station, the agents escorted Jones into the office of the chief of police in order to interview her privately. At the outset of the interview, the agents reiterated that they wished to speak to her concerning their investigation into the passing of counterfeit money and that she was not under arrest. They informed her, however, that the United States Attorney would be advised of any cooperation she offered.

At no time did either agent advise her as to her *Miranda* rights. At the suppression hearing Agent Rodriguez testified, "I don't use the *Miranda* warning unless I am in a custodial interview situation and clearly [this interview] was not custodial." During the interview Agent Greenwood offered Jones a cold drink and permitted her to use the bathroom. Jones testified that the agents were "nice" to her and that they did not threaten her in any way.

The interview itself was approximately one hour in duration. Although Jones initially denied involvement in the passing of any counterfeit money, about forty-five minutes into the interview she made inculpatory statements. Agent Rodriguez reduced her statement to writing and read it aloud to her. Although the testimony at the suppression hearing was conflicting on this point, Jones stated that she disagreed with Agent Rodriguez over one sentence in the statement. Nevertheless, Jones initialled and signed the statement, after which she was fingerprinted and photographed.

Shortly after 2:00 P.M. the agents drove Jones back to her place of employment, where they encountered Penny. The agents approached him and identified themselves. They asked if Penny would accompany them to the Southport Police Station to discuss their on-going counterfeiting investigation. The agents advised Penny that he was not under arrest.

Penny agreed to accompany the agents. Before they departed, Jones told the agents that she wished to go with them. The agents advised her that if she returned to the station, she would have to remain outside the office during Penny's interview. The agents drove Penny to the police station in their automobile while Jones followed in her car.

The agents returned to the office of the chief of police where they interviewed Penny. At the commencement of the interview the agents again told Penny that he was not under arrest. As they had advised Jones previously, the agents informed Penny that any cooperation he offered would be reported to the United States Attorney. At no time was Penny given the *Miranda* warnings.

After approximately 45 minutes of discussion, Penny admitted that he had possessed some counterfeit bills and had passed some of them at several stores during the previous weekend. Agent Rodriguez reduced Penny's statement to writing. He read it aloud to Penny who signed it.

After the completion of Penny's interview, the agents decided to take a brief lunch break. Agent Greenwood told appellees that they could obtain food and drink at a convenience store across the street from the police station. Appellees declined the offer and waited with Agent Rodriguez while Agent Greenwood went to obtain the agents' lunch. While they waited, Agent Rodriguez informed Jones that Penny's statement included the admission that he had passed counterfeit bills at various stores during the previous weekend and that Jones had been with him at the time. Jones acknowledged that she had omitted that fact from her statement and that she indeed had been with Penny.

Upon Agent Greenwood's return, Penny was fingerprinted and photographed. Jones and Agent Rodriguez returned to the police chief's office where Rodriguez took notes of their interview. At the conclusion, Jones and Penny left the station.

On June 6 an indictment was filed charging appellees with one count of possessing and uttering counterfeit monies and aiding and abetting the same, in violation of 18 U.S.C. §§ 472 and 2 (1982). On July 17 appellees moved to suppress their confessions. A hearing was held on August 18. In an opinion and order filed September 15, the district court granted the suppression motions.

The court held that when appellees were interrogated they were "in custody" for purposes of *Miranda;* and that, since no *Miranda* warnings had been given prior to this custodial interrogation, appellees' confessions were suppressed. The court rejected the government's argument that appellees' voluntary appearance at the police station and the agents' advice to them that they were not under arrest were sufficient to warrant a finding of no custody. The government distinguished *Oregon v. Mathiason,* 429 U.S. 492 (1977), and our decision in *Davis v. Allsbrooks,* 778 F.2d 168 (4th Cir.1985).

On September 17 the government took the instant appeal pursuant to 18 U.S.C. § 3731 (1982).

For the reasons stated below, we reverse the order of the district court suppressing appellees' statements.

## II.

### A.

The Fifth Amendment provides in relevant part: "No person ... shall be compelled in any criminal case to be a witness against himself...." The Supreme Court in *Miranda, supra,* addressed the problem of how best to protect the Fifth Amendment privilege in light of the coercive pressures that can be brought to bear upon a suspect when he is involved in custodial interrogation. The Court held:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

384 U.S. at 444. The procedural safeguards by now are so familiar that most people are able to recite them by rote: "[p]rior to any questioning the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.*

In the ensuing years the Supreme Court frequently has reaffirmed the central principle of *Miranda:* if an individual is *taken into custody* by a law enforcement officer and the officer *interrogates* the individual without informing him of the rights explicated above, the individual's response may not be introduced in the prosecution's case-in-chief as evidence of guilt. *E.g., California v. Beheler,* 463 U.S. 1121 (1983); *Estelle v. Smith,* 451 U.S. 454 (1981); *Oregon v. Mathiason,* 429 U.S. 492 (1977); *Beckweith v. United States,* 425 U.S. 341 (1976); *Orozco v. Texas,* 394 U.S. 324 (1969).

■ This exclusionary rule is not implicated, therefore, in the absence of the inherently coercive custodial interrogation that *Miranda* guards against. "In the cases before us today ... we concern ourselves primarily with this interrogation atmosphere and the evils it can bring.... Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda, supra,* 384 U.S. at 456, 478. The question of whether an individual is "in custody" must be made on a case-by-case basis. As we stated in *Davis, supra,* 778 F.2d at 171, we are to be guided by the standards for "custody" articulated by the Supreme Court. The applicability of those standards to the circumstances of this case does not require extended analysis.

### B.

"[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler, supra,* 463 U.S. at 1125, (quoting *Mathiason, supra,* 429 U.S. at 495). An unarticulated plan of a law enforcement officer has no bearing on the question of custody. *See Berkemer v. McCarthy,* 468 U.S. 420 (1984); *Oregon v. Elstad,* 470 U.S. 298, (1984). The fact that the individual is the "focus" of an investigation is not significant to the inquiry, *Beckwith, supra,* 425 U.S. at 347, nor is the locale in which the interrogation takes place. *Compare Orozco, supra,* 394 U.S. at 327 (*Miranda* warnings apply to interrogation in defendant's bedroom), *with Beheler, supra,* 463 U.S. at 1122–1123 (defendant not "in custody" during questioning at police station). It therefore is not custody per se but "the *custodial* nature of the interrogation which triggers the necessity for adherence to the specific requirements of the *Miranda* holding." *Beckwith, supra,* 425 U.S. at 346 (emphasis in original).

The record in this case establishes that Jones and Penny were not formally arrested on the day the challenged interrogation took place. At the conclusion of the interviews, appellees left the police station together and remained free until the indictment was filed approximately one month later. The question then is whether appellees were subjected to such a restraint on their freedom of movement that *Miranda* warnings were required in any event. We hold that they were not.

The Supreme Court consistently has held that, when a suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview, a finding of "custody" for *Miranda* purposes is unwarranted.

In *Mathiason, supra,* the police initiated contact with the defendant who agreed to come to the police department. The officer with whom he met informed him that, although he was not under arrest, he was suspected of committing a burglary and that the truthfulness of any statement that he made would be evaluated by the District Attorney. The officer also informed the defendant, falsely, that his fingerprints were found at the scene of the crime. The defendant confessed to the burglary and made a taped confession, after which he was released pending a decision to bring formal charges. The interview lasted approximately 30 minutes. The Oregon Supreme Court held that Mathiason had been in custody for purposes of *Miranda,* a holding reversed summarily by the United States Supreme Court:

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment'. Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.... *Miranda* warnings are required only where there

has been such a restriction on a person's freedom as to render him 'in custody' ''. 429 U.S. at 495. Relying upon Mathiason's voluntary appearance at the police station, the officer's advice that he was not under arrest, and his freedom to leave at the conclusion of the interview, the Court held that Mathiason's "freedom to depart was [not] restricted in any way." *Id.*

In *Beheler, supra,* Beheler and his accomplices were attempting to steal drugs from a drug dealer when one of the accomplices killed the dealer. Beheler invited the police to the scene of the crime and told them who had committed the murder. He also told them where the murder weapon was located and accompanied the officers to procure it. Later that evening Beheler voluntarily agreed to accompany the officers to the police station. He was told specifically that he was not under arrest.

At the police station, the officers informed Beheler that any statement he chose to make would be evaluated by the District Attorney. After an interview which lasted approximately 30 minutes, Beheler was permitted to return to his home. He was arrested five days later in connection with the murder and was convicted of the crime. The California Court of Appeal reversed the conviction, holding that the interview constituted custodial interrogation which activated the need for *Miranda* warnings. The Supreme Court summarily reversed the Court of Appeal, stating that "this question has already been settled clearly by past decisions of this Court...." The Court stated:

> "In the present case, the 'totality of the circumstances' on which the court focused primarily were that the interview took place in a station house and that Beheler was a suspect because he had spoken to police earlier. But we have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' "

463 U.S. at 1125. The Court concluded that "[i]t is beyond doubt that Beheler was neither taken into custody nor significantly deprived of his freedom of action. Indeed, Beheler's freedom was not restricted in any way whatsoever." *Id.* at 1123.

Our court recently has applied the rationale of *Mathiason* and *Behler* in *Davis, supra.* In the latter case, a police officer left a note for Davis, a suspect in a brutal murder, asking Davis to "come see him". Two days after receiving the note, Davis came to the police station. Upon his arrival, he was given the *Miranda* warnings and was questioned for two hours. At that time, the detectives decided to take a dinner break and asked Davis to return after he had eaten. Davis agreed and the detectives drove him home. A few hours later, after dinner, the detectives drove toward Davis' house to see if he was walking back to the station. When they found him near his house, the detectives offered him a ride, which he accepted. Upon returning to the police station, Davis again was advised of his *Miranda* rights. Shortly after the questioning began, Davis told the officers he did not want to talk about the case. The detectives persisted. They placed pictures of the crime scene in front of him. Davis began to cry and requested to be permitted to use the restroom. He was escorted to the restroom and upon his return the questioning continued. At some point he again was escorted to the restroom. A short time later, Davis confessed to the crime. He was convicted and appealed to our court from a judgment denying his petition for a writ of habeas corpus. He argued, among other things, that his confession was obtained in violation of his *Miranda* rights. We disagreed and concluded that, since Davis was not in custody when he confessed, *Miranda* was inapplicable. We recognized that Davis' initial contact with the police was the result of his voluntary response to their request to speak to him and that conditions at the police station were as informal as one could expect. Though the initial interview had lasted approximately two hours, "it was not a marathon session designed to force a confession". *Davis, supra,* 778 F.2d at 171. We found it insignificant that appellant was given a ride to the police station by the detectives, since Davis accepted the

ride by voluntarily getting into the car and the crime was not discussed en route. We also rejected the contention that the escort Davis was given each time he used the restroom required a conclusion that he was in custody. We held to be lacking in merit Davis' argument that the detectives' failure to tell him he was free to go supported the conclusion that he was in custody.

### C.

Applying the above principles to the case before us, we find that nothing in the record indicates that appellees should have been given *Miranda* warnings when they first were interviewed on May 6. Appellees were not arrested. They came to the police station as a result of their voluntary responses to the agents' requests to speak with them. They were allowed to leave unhindered after a relatively brief interview.

Like the suspects in *Beheler* and *Mathiason,* appellees' freedom was not restricted in any way. Although appellees invite us to place great emphasis on the fact that they were driven to the police station by the agents, we decline the invitation. The Supreme Court held that fact to be constitutionally irrelevant in *Beheler,* as we did in *Davis.* We again embrace that reasoning in the instant case. We observe further that, as in *Davis,* Jones testified that the agents did not discuss the case with her during the ride.

Jones and Penny contend that the agents had a duty to advise them that they were "free to leave" at anytime, and the failure to do so renders their confessions constitutionally defective. As in *Beheler* and *Mathiason,* the agents in the instant case specifically advised appellees that they were not under arrest. "[I]nforming a suspect that he is not under arrest is one factor frequently considered to show lack of custody.... Where, as here, the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive." *Davis, supra,* 778 F.2d at 171–72 (citations omitted). We find appellees' contention to be without merit.

The overall conditions at the Southport police station were as informal as one could expect. Appellees were told that they were free to use the restrooms and both were told that they could obtain food or drink at the convenience store across the street. Jones testified that the agents were "nice" to her. The interviews of both Penny and Jones each lasted approximately forty-five minutes. This was not much longer than the thirty minute interviews sanctioned in *Mathiason* and *Beheler* and considerably less than the two to three hour interview in *Davis.* Although the district court found that appellees were interviewed in a "small" room, the record fails to indicate the dimensions of the room.

Turning to appellees' assertion that the agents induced their confessions by telling them that any cooperation would be brought to the attention of the United States Attorney, we hold that such a statement is irrelevant to a determination of custody in this case. *Accord, Beheler, supra,* 463 U.S. at 1122 (any statement made would be evaluated by District Attorney); *Mathiason, supra,* 429 U.S. at 494 (same).

The safeguards of *Miranda* are required in the case of "interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." *Miranda, supra,* 384 U.S. at 445. This is not that case.

### III.

To summarize:

We reverse the order of the district court suppressing appellees' confessions. We conclude that the record is devoid of any evidence that Jones and Penny were taken into custody or deprived of their freedom in any significant manner. We hold, therefore, that they were not entitled to *Miranda* warnings under these noncustodial circumstances and that the agents' failure to give *Miranda* warnings provides no basis for the suppression of evidence.

REVERSED.