**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4533**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EZEKIEL DONJA GARDNER,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. James C. Fox, Senior District Judge. (4:11-cr-00065-F-1)

Argued: March 24, 2016      Decided: May 18, 2016

Before MOTZ, GREGORY, and KEENAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Motz and Judge Gregory joined.

**ARGUED:** William Michael Dowling, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellant. Phillip Anthony Rubin, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

Ezekiel Gardner was tried by a jury and found guilty of possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924. The conviction was based on police officers' recovery of a handgun from Gardner's vehicle during a traffic stop, after receiving a tip from a confidential informant that Gardner, a felon, possessed a firearm. At sentencing, the district court determined that Gardner was an armed career criminal based on his three prior convictions for felony common law robbery in North Carolina (North Carolina common law robbery), and sentenced him to serve a term of 262 months' imprisonment.

On appeal, Gardner challenges: (1) the district court's denial of his motion to suppress the search of his vehicle and certain statements he made to the police; (2) the court's denial of his motion for a new trial; and (3) the court's determination at sentencing that he is an armed career criminal. Upon our review, we affirm the district court's denial of Gardner's motion to suppress and his motion for a new trial. However, because we conclude that North Carolina common law robbery is not categorically a violent felony, we hold that the district court erred in sentencing Gardner as an armed career criminal. Accordingly, we vacate Gardner's sentence and remand for resentencing.

2

I.

A.

The government's evidence regarding the traffic stop showed that on January 13, 2011, Detective Kenneth Adams of the police department in Farmville, North Carolina, received a telephone call from a reliable, confidential informant. The woman stated that Gardner was a convicted felon who possessed a firearm, that he was driving a white Lincoln Town Car, and that he presently was located at a particular house on Thorne Street in Farmville. Detective Adams already had a working relationship with this informant, who had completed at least five controlled drug purchases for a regional drug enforcement task force, and consistently had provided accurate information.

Based on the informant's telephone call, Detective Adams, Lieutenant Paul McLawhorn, and Chief Donnie Greene proceeded in a squad car to the identified house on Thorne Street and saw a white Lincoln Town Car parked near the house. The officers drove around the block, taking time to confirm that Gardner was the registered owner of the vehicle. When the officers approached the house again, they saw that Gardner had entered the Lincoln and was driving toward a nearby intersection. The officers observed Gardner make a three-point turn in the intersection and begin driving in the opposite direction. The

3

officers turned to follow Gardner's vehicle and initiated a traffic stop.

Detective Adams observed that "as soon as the blue lights come on, I saw [Gardner] dip down in the car, and I saw his right shoulder disappear as if he was – he was either reaching for something or putting something under the seat." After Gardner stopped his car, Adams and McLawhorn approached the car. Adams held his gun at his side as he walked toward the driver-side door. Chief Greene remained in the squad car to request assistance.

Adams confirmed Gardner's identity by examining his driver's license, and asked Gardner to step out of the vehicle. Adams observed that Gardner appeared nervous and kept looking in the direction of the vehicle's floor. When Adams asked Gardner if he had any weapons on his person, Gardner replied that he did not. Upon conducting a patdown search of Gardner, Adams did not find a weapon. Adams ordered Gardner to walk to the rear of the vehicle, but did not place handcuffs on him at this time.

Adams informed Gardner that Adams had received information that Gardner had a firearm in his possession. When Adams asked Gardner if he had "anything illegal in his car," Gardner responded by hanging his head. Continuing, Adams asked, "What is it that is illegal in your car[?]." Gardner replied, "I have a gun." When asked if he was allowed to possess a firearm,

4

Gardner stated that he was not and that he was a convicted felon.

McLawhorn searched the passenger compartment of the car, and found a handgun underneath the driver's seat. At that point, Gardner was placed in handcuffs and was taken to the police station.

After arriving at the station, Adams and Detective Rose Edmonds advised Gardner of his Miranda rights, which Gardner waived by signing a written waiver form. Gardner told the officers that he had purchased the gun from "Cobe," that Gardner later loaned the gun to "Pudgy," and that Gardner had received the firearm back from "Pudgy" that day.

## B.

Before trial, Gardner moved to suppress both the evidence recovered from his car during the stop and the statements he made at the police station following his arrest. The district court denied the motion, concluding that the search was justified by the "automobile exception" to the warrant requirement of the Fourth Amendment, and that, therefore, any post-arrest statements were lawfully obtained.

At trial, Gardner renewed his suppression motion. In addition to restating his earlier arguments, he also sought suppression of the statements he made to the police during the traffic stop on the ground that he was not advised of his

5

Miranda rights. The district court again denied Gardner's motion, as well as his motion for judgment of acquittal. The jury found Gardner guilty of the offense charged, and the district court later denied Gardner's motion for a new trial.

At sentencing, Gardner challenged his classification as an armed career criminal. He argued that his predicate convictions for North Carolina common law robbery did not qualify categorically as violent felonies. The district court disagreed, concluding that the convictions qualified as violent felonies under the residual clause of the Armed Career Criminal Act (the ACCA). See 18 U.S.C. § 924(e)(2)(B). The court sentenced Gardner to serve a term of 262 months' imprisonment, which sentence fell at the bottom of the Sentencing Guidelines range. This appeal followed.

II.

Gardner raises several issues on appeal, but primarily challenges the legality of the search of his vehicle and his classification as an armed career criminal. We first address the legality of the search.

A.

Gardner argues that the police officers lacked reasonable suspicion to initiate a stop of his vehicle. He contends that the confidential informant was not a reliable source of

information, and that she did not provide sufficient detail about Gardner such as predictive information regarding his criminal behavior. Alternatively, Gardner asserts that even if the initial stop was lawful, the stop evolved into an unlawful arrest, and he should have been given Miranda warnings before any questioning occurred. Thus, Gardner challenges as inadmissible the statements he made after the stop and also seeks to suppress the gun uncovered from his vehicle. We disagree with Gardner's arguments.

We review a district court's factual findings in deciding a motion to suppress for clear error, and the court's legal conclusions de novo. United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013). We construe the evidence in the light most favorable to the government, the prevailing party in the district court. United States v. Farrior, 535 F.3d 210, 217 (4th Cir. 2008), abrogated on other grounds by United States v. Williams, 808 F.3d 238 (4th Cir. 2015).

An officer must have reasonable suspicion of criminal activity to perform an investigative stop authorized by Terry v. Ohio, 392 U.S. 1 (1968). United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). Under this standard, the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (citation omitted).

7

This standard is less demanding than the probable cause standard, and can be based on "information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

We have stated that when an investigative stop is based on unverified information provided by a known informant, a tip of this nature "may alone justify a reasonable suspicion of criminal activity." United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004). And when police obtain information corroborating such a tip, this circumstance adds significant support for a finding of reasonable suspicion. See generally id.; United States v. Harris, 39 F.3d 1262 (4th Cir. 1994).

In Singh, a confidential informant had reported that a tractor-trailer, bearing Canadian license plates and being driven by two men of Indian descent, contained a large amount of marijuana and had become disabled on a highway in Greensboro, North Carolina. 363 F.3d at 350. After police initially could not find the truck at the described location, the informant provided more precise information. Id. When officers arrived at the specified location, they observed the tractor-trailer being towed. Id. at 351. The officers halted the towing operation, and ultimately found marijuana in the disabled tractor-trailer. Id. at 351-52. The district court granted the

defendants' motion to suppress, holding that the seizure of the defendants was not supported by a reasonable suspicion of criminal activity.  Id. at 353.

In reviewing this decision on appeal, we observed that before stopping the tractor-trailer, the officers had verified its location, the source of its license plates, and the description of the vehicle's occupants.  Id. at 355.  Based on this record, we concluded that the district court erred in holding that the officers lacked reasonable suspicion to execute the vehicle stop.  Id. at 355-56.

The present case is governed by our decision in Singh.  As in Singh, the officers here received a tip from a known informant that a certain convicted felon driving a white Lincoln Town Car could be found at a particular location with a gun in his possession.  This tip alone may have supported a finding of reasonable suspicion.[1]  See id. at 355.  But the officers in the present case also had corroborated some of the information provided by the informant, namely, the presence of a white Lincoln Town Car at the described location and verification that Gardner was the owner of that vehicle.  While the officers did not confirm that Gardner was a convicted felon before initiating

---

[1] We find no merit in Gardner's argument that the informant, his former girlfriend, was unreliable given their prior relationship and the fact that police had paid her for providing the tip in question.

9

the stop, every detail provided by a tipster need not be independently verified to support a finding of reasonable suspicion. See White, 496 U.S. at 331-32. Accordingly, we hold that the district court did not err in concluding that the traffic stop was supported by reasonable suspicion.[2]

We also disagree with Gardner's alternative argument that the encounter matured into a de facto arrest, requiring that rights be given pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), when the officers detained Gardner at the rear of his vehicle. The Supreme Court has held that an individual is not "in custody" for purposes of Miranda when an officer detains him to ask "a moderate number of questions . . . to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984). In the present case, the officers asked Gardner questions directly related to their reasonable suspicion that he had a firearm in

---

[2] We are not persuaded by Gardner's reliance on the Fifth Circuit's decision in United States v. Roch, 5 F.3d 894 (5th Cir. 1993). In the present case, the informant provided many of the details that were lacking in Roch, such as the make and model of the car, as well as the suspect's full name. Moreover, the Fifth Circuit relied heavily in its analysis on cases regarding the need to corroborate information obtained from anonymous informants. See id. at 898-99 (citing White, 496 U.S. 325). In contrast, the officers here relied on information supplied by a known, reliable informant, which both this Court and the Supreme Court have acknowledged may be sufficient, even absent any corroboration, to support a finding of reasonable suspicion. See Singh, 363 F.3d at 355; Adams v. Williams, 407 U.S. 143, 146-47 (1972).

his possession. The fact that Gardner did not feel free to leave did not convert this brief period of questioning into the functional equivalent of a "stationhouse interrogation" that would require Miranda warnings. Id. at 438-39. We therefore conclude that because Gardner's interaction with the police during the traffic stop did not evolve into a de facto arrest, his statement concerning the gun was not obtained in violation of his Fifth Amendment rights.

Gardner's acknowledgement of the gun, together with the informant's tip and Gardner's furtive behavior, provided the officers probable cause to search Gardner's car. We therefore conclude that the officers lawfully searched Gardner's automobile.[3] See United States v. Kelly, 592 F.3d 586, 589-90 (4th Cir. 2010). Accordingly, we hold that the district court

---

[3] The officers also could have searched Gardner's automobile lawfully based solely on their reasonable belief that Gardner was dangerous and might "gain immediate control" of a firearm in the passenger compartment of his car. See Michigan v. Long, 463 U.S. 1032, 1049 (1983). The informant's tip, along with Adams's observation that Gardner reached down below his seat and nervously looked in the direction of the car floor, independently justified the search of the car. Under this analysis, the validity of the search is not affected by Gardner's detention at the rear of the vehicle during the traffic stop. See id. at 1051-52.

did not err in denying Gardner's motion to suppress his statements and the weapon found in his car.[4]

## B.

Gardner also challenges his designation as an armed career criminal under the ACCA. He argues that his three predicate convictions for North Carolina common law robbery do not qualify as "violent felonies" because: (1) the definition of a violent felony under the ACCA's "residual clause" is unconstitutional; and (2) his robbery convictions do not qualify as violent felonies under the "force clause" of the ACCA. The government counters that Gardner's convictions categorically are violent felonies under the force clause because North Carolina common law robbery, which requires the taking of property by means of "violence" or "fear," necessarily involves the "use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). We disagree with the government's argument.

## 1.

Gardner preserved this issue in the district court and, therefore, we review de novo the question whether his prior state convictions qualified as "predicate felony conviction[s]

---

[4] We likewise affirm the district court's denial of Gardner's motion for a new trial, which was based on the same argument that the district court improperly admitted illegally obtained evidence.

for purposes of a federal sentence enhancement." United States v. Valdovinos, 760 F.3d 322, 325 (4th Cir. 2014). A "violent felony" is defined under the ACCA as any crime "punishable by imprisonment for a term exceeding one year" that either "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the force clause), or "is burglary, arson, or extortion, [or] involves use of explosives" (the enumerated language), or "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the residual clause). 18 U.S.C. § 924(e)(2)(B)(i), (ii). Because the Supreme Court recently held in Johnson v. United States, 135 S. Ct. 2551, 2557 (2015), that the language of the residual clause is unconstitutional, North Carolina common law robbery can qualify as a "violent felony" only if it matches the definition of a violent felony under the force clause.[5]

---

[5] Contrary to the government's suggestion, North Carolina common law robbery does not categorically match the crime of extortion listed in the enumerated language of 18 U.S.C. § 924(e)(2)(B)(ii). North Carolina common law robbery involves the non-consensual taking of money or property from another, while the generic crime of extortion is defined as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409 (2003) (citation omitted); see also 18 U.S.C. § 1951(b)(2) (defining Hobbs Act extortion). The element of consent "is the razor's edge that distinguishes extortion from robbery." United States v. Zhou, 428 F.3d 361, 371 (2d Cir. 2005). Notably, both North Carolina and the federal government have codified extortion as a crime (Continued)

13

North Carolina common law robbery is the "felonious, non-consensual taking of money or personal property from the person or presence of another by means of violence or fear." North Carolina v. Smith, 292 S.E.2d 264, 270 (N.C. 1982). Typically, when determining whether a previous conviction qualifies as a violent felony under the ACCA, we apply the "categorical approach," considering only the conviction itself and the elements of the offense, not the particular facts of the crime. United States v. Baxter, 642 F.3d 475, 476 (4th Cir. 2011).

Only in a "narrow range of cases," when a crime is divisible, do we employ the "modified categorical approach," in which a court may consider a limited set of documents to determine the basis of a defendant's conviction. See Descamps v. United States, 133 S. Ct. 2276, 2283-85 (2013). A crime is divisible when it includes multiple "alternative elements" that create different versions of the crime, at least one of which would qualify under the federal definition and at least one of which would not. See id.; Omargharib v. Holder, 775 F.3d 192, 197-98 (4th Cir. 2014).

A crime is not divisible simply because it may be accomplished through alternative means, but only when

---

distinct from robbery. See N.C. Gen. Stat. § 14-118.4 (2015); 18 U.S.C. § 1951(b)(1), (2).

14

alternative elements create distinct crimes.  Omargharib, 775 F.3d at 198.  Alternative elements of a crime, as opposed to alternative means of committing a crime, are "factual circumstances of the offense that the jury must find unanimously and beyond a reasonable doubt."  Id. (citation and internal quotations omitted).  Therefore, when determining the divisibility of a crime, we may consider how "courts generally instruct juries with respect to that offense."  See United States v. Royal, 731 F.3d 333, 341 (4th Cir. 2013).

Under North Carolina's pattern jury instructions, the final element of common law robbery requires "that the taking was by violence or by putting the person in fear."  N.C. Pattern Instructions—Crim. 217.10.  Thus, the jury need not agree unanimously that the felonious taking was committed by the use of violence or by instilling fear, only that one of the two means was employed.  Accordingly, North Carolina common law robbery may be committed by the alternate means of violence or fear that do not constitute different elements of distinct crimes.  The crime, therefore, is an indivisible offense, in which the modified categorical approach "has no role to play." Descamps, 133 S. Ct. at 2285.

2.

We turn now to apply the categorical approach.  To qualify as a categorical match with the force clause, North Carolina

15

common law robbery necessarily must have as an element the "use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). "Physical force" for purposes of the force clause does not include the "slightest offensive touching" that might sustain a misdemeanor battery conviction under some state laws. See Johnson v. United States, 559 U.S. 133, 139 (2010). Instead, "physical force" within the context of the ACCA means "violent force—that is, force capable of causing physical pain or injury to another person." Id. at 140 (emphasis in original).

In determining whether North Carolina common law robbery necessarily requires the use, attempted use, or threatened use of "physical force," within the meaning of the ACCA, we focus on "the minimum conduct necessary for a violation" under state law. Castillo v. Holder, 776 F.3d 262, 267 (4th Cir. 2015). Such minimum culpable conduct includes any conduct to which there is a "realistic probability, not a theoretical possibility," that a state would apply the law. Moncrieffe v. Holder, 133 S. Ct. 1678, 1684-85 (2013) (citation omitted). When considering a North Carolina common law crime, our analysis of minimum culpable conduct is informed by decisions of the Supreme Court of North Carolina, while decisions of North Carolina's intermediate appellate court "constitute the next best indicia

16

of what state law is." See Castillo, 776 F.3d at 268 & n.3 (citation omitted).

As we noted above, North Carolina common law robbery may be committed by the alternative means of violence or fear. Accordingly, if either means of committing this crime does not require the "use, attempted use, or threatened use" of "physical force," then North Carolina common law robbery does not categorically match the force clause of the ACCA. See Omargharib, 775 F.3d at 197. We first address North Carolina common law robbery by means of "violence."

With respect to the commission of robbery by means of "violence," the Supreme Court of North Carolina has explained: "Although actual force implies personal violence, the degree of force used is immaterial, so long as it is sufficient to compel the victim to part with his property." State v. Sawyer, 29 S.E.2d 34, 37 (N.C. 1944). This definition, therefore, suggests that even de minimis contact can constitute the "violence" necessary for a common law robbery conviction under North Carolina law.

Later decisions by North Carolina's intermediate appellate court support the conclusion that even minimal contact may be sufficient to sustain a robbery conviction if the victim forfeits his or her property in response. For example, the North Carolina Court of Appeals has held that a defendant's act

of pushing the victim's hand off of a carton of cigarettes was sufficient "actual force" to uphold a common law robbery conviction. See State v. Chance, 662 S.E.2d 405, at *3-4 (N.C. Ct. App. June 17, 2008) (unpublished). Also, the Court of Appeals upheld a conviction when a defendant pushed the shoulder of an electronics store clerk, causing her to fall onto shelves while the defendant took possession of a television. State v. Eldridge, 677 S.E.2d 14 (N.C. Ct. App. June 2, 2009) (unpublished).

Based on these decisions from North Carolina's appellate courts, we conclude that the minimum conduct necessary to sustain a conviction for North Carolina common law robbery does not necessarily include the use, attempted use, or threatened use of "force capable of causing physical pain or injury to another person," as required by the force clause of the ACCA. Johnson, 559 U.S. at 140. Therefore, we hold that North Carolina common law robbery does not qualify categorically as a "violent felony" under the ACCA.[6]

Our analysis is not altered by decisions of this Court interpreting the crime of robbery in other jurisdictions. See

---

[6] Because we conclude that North Carolina common law robbery committed by means of "violence" does not require the use, attempted use, or threatened use of "physical force," within the meaning of the ACCA, we need not consider whether robbery committed by means of "fear" otherwise would require the use, attempted use, or threatened use of "physical force."

United States v. Presley, 52 F.3d 64, 69 (4th Cir. 1995) (concluding that Virginia common law robbery, which requires the taking of property "by violence or intimidation," is a violent felony under the force clause); United States v. Wilson, 951 F.2d 586, 588 (4th Cir. 1991) (explaining that Maryland common law robbery is a "crime of violence" under the force clause of the career offender guidelines). The decisions in Presley and Wilson do not inform our decision today, because they pre-date the Supreme Court's decision in Moncrieffe, and do not evaluate the minimum conduct to which there is a realistic probability that a state would apply the law.

Moreover, the definitions of common law robbery in Maryland and Virginia have little or no relevance to North Carolina appellate courts' interpretation of North Carolina law. As this Court recently has explained, "a State is entitled to define its crimes as it sees fit."[7]    United States v. McNeal, -- F.3d --, 2016 WL 1178823, at *10 (4th Cir. Mar. 28, 2016). And North Carolina has defined common law robbery to encompass cases involving the use of minimal force, which does not satisfy the condition of "violent force" required by federal law for application of the ACCA enhancement. Accordingly, we hold that

---

[7] Likewise, this Court's decision in McNeal does not impact our decision, because that case addressed the federal crime of armed bank robbery.

the district court erred in applying the ACCA enhancement based on Gardner's convictions for North Carolina common law robbery, and we vacate Gardner's sentence and remand the case for re-sentencing.[8]

## III.

For these reasons, we affirm Gardner's conviction. We vacate Gardner's sentence based on the district court's erroneous application of the ACCA enhancement and remand for re-sentencing.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

---

[8] Because we vacate Gardner's sentence, we do not address his other arguments challenging his sentence.