**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-4175**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

ERVIN DWAYNE LEGGETTE, a/k/a Ervin Dewayne Leggette,

        Defendant – Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, Chief District Judge.  (1:20-cr-00016-TDS-1)

---

Argued:  September 16, 2022             Decided:  January 10, 2023

---

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Quattlebaum and Senior Judge Floyd joined.

---

**ARGUED:**  Ames Colby Chamberlin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant.  Margaret McCall Reece, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Louis C. Allen, Federal Public Defender, Greensboro, North Carolina, Brittany Speas, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Winston-Salem, North Carolina, for Appellant.  Sandra J. Hairston, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

Late one spring evening, Dwayne Leggette and Deborah Marshall were trespassing in a public park after it closed. When officers saw their car, they investigated the trespass. The officers found a gun abandoned in a nearby trash can, so they frisked Leggette and questioned him about the gun. After first denying the gun was his, Leggette admitted he was a felon and that he owned the gun. The officers arrested Leggette, who was then federally indicted for being a felon in possession of a firearm. He sought to suppress his incriminatory statements, arguing that his statements in the park were inadmissible because he was "in custody" under *Miranda* and so the officers needed to read him his *Miranda* rights before questioning him about the gun. The district court disagreed, and Leggette pleaded guilty. We find that the district court correctly determined that Leggette was not "in custody" when questioned in the park. So we affirm.

## I.    Background

Around 11:35 PM one night, Officer David Rochelle noticed a car parked in the parking lot of a public park.[1] This park, owned by the city of Winston-Salem, closed to

---

[1] This narrative is derived largely from the district court's factual findings following an evidentiary hearing at which both officers testified, and the court viewed police-body-camera footage with audio. The district court found both officers "to be credible" and stated that its factual findings were "based on the preponderance of the evidence." J.A. 92. Given that the court found them credible, portions of the factual summary are also taken from the officers' testimony to supplement the district court's telling of events.

"In assessing a district court's decision on a motion to suppress, we review factual findings for clear error and legal determinations de novo." *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). So we defer to the district court on "findings about the circumstances surrounding the interrogation," but review de novo "whether those circumstances create a custodial situation requiring *Miranda* warnings." *United States v.* (Continued)

the public at 10:30 PM.  Being in the park after it closed was trespassing.  So Officer Rochelle pulled into the lot when he saw the car.  He called for backup and began investigating the dark area with his flashlight.  Near the park's picnic area, he found Leggette and Marshall walking toward him.  They told him they were just "hanging" in the park, and he told them the park was closed.  Officer Rochelle's backup arrived and began looking around the picnic area while Officer Rochelle walked with Leggette and Marshall back to the parking lot and gathered biographical information about the pair.

The backup officer soon discovered a gun in a bag inside a trash can.  Officer Rochelle learned over the radio about the gun.  He patted Leggette down and determined that he was not otherwise armed.  Officer Rochelle then asked Leggette about the gun found in the trash can.  During a ninety-second exchange, Officer Rochelle asked Leggette about the gun three times.[2]  The first two times, Leggette denied the gun was his, although he did

---

*Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998); *see also Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995).  "When a district court has denied a suppression motion, we view the evidence in the light most favorable to the government." *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016).

[2] The conversation is reproduced below as relayed by the district court who listened to a recording of it at the hearing:

> Officer Rochelle: "What's the gun over there for man?  Be honest with me man. You were over there."
> Leggette: Denies the gun is his but says "I just did 15 years" in the course of his response.
> Officer Rochelle: "Help me understand though why's there a firearm down there?"
> Leggette: "Like I said, I don't know where he got that firearm from."
> Officer Rochelle: "Listen, we've been doing this long enough.  There's no way. People don't come down here and leave firearms like that.  So, just be honest with me.  If you be honest with me, it's going to go a long way.  Okay.  Now, I know that it's hard to say that sometimes.  Listen, you got to just be real with me.  Why's there

(Continued)

volunteer that he "just did 15 years [in prison]." J.A. 93. Officer Rochelle said that he did not believe Leggette, explained that Leggette's honesty would "go a long way," and asked once more. J.A. 94. This time Leggette admitted that the gun was his and that he was not supposed to have it. Officer Rochelle did not search or question Marshall.

After Leggette's confession, Officer Rochelle handcuffed Leggette and put him in the patrol car. As Leggette was getting into the car, Officer Rochelle asked what type of gun it was. But before Leggette could answer, Officer Rochelle told Leggette "never mind, don't worry about that. I'll ask you later." J.A. 94.[3] Officer Rochelle then drove Leggette to the detention center.

Once at the detention center, Leggette was placed in a separate room and read his *Miranda* rights for the first time.[4] Leggette said he understood his rights, agreed to speak, and confessed again.

Afterward, Leggette was indicted for being a felon in possession of a firearm. He then sought to suppress his incriminating statements. Following a suppression hearing at which the officers testified, the district court issued a thoughtful opinion denying Leggette's motion to suppress.

---

a firearm down there? There's a gun down there. I mean, he didn't just make that up. He didn't bring a gun down and put it down there himself. He found it. So be real with me, man."

Leggette: "I had the gun. Yeah, I had a gun. The gun is for protection."

J.A. 93–94.

[3] Officer Rochelle later told another officer that he should not have asked this.

[4] Officer Rochelle did not have a copy of his *Miranda* card and so had another officer text him a picture of their card, which he used to read the warning.

Leggette then pleaded guilty, reserving the right to appeal the denial of his motion to suppress his statements. He was sentenced to 180 months in prison and now appeals.

## II.    Discussion

The familiar *Miranda* warnings are required for the "*in-custody interrogation* of persons suspected or accused of crime." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966) (emphasis added). And without those *Miranda* warnings, any statements made during a custodial interrogation are inadmissible in the prosecution's case in chief. *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995). But so long as a defendant is not "in custody," then statements made during an interrogation remain admissible, even if the defendant were not given *Miranda* warnings. The district court found that Leggette was not "in custody" when he made incriminating statements at the park. So *Miranda* warnings were not required and the statements were admissible. We agree and affirm.

"An individual is in custody for *Miranda* purposes when, under the totality of the circumstances, 'a suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). This is an objective inquiry. *J. D. B. v. North Carolina*, 564 U.S. 261, 270–71 (2011); *see also Parker*, 262 F.3d at 419 ("Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead [on] the objective circumstances of the interrogation.").

A court asks two questions when determining whether a suspect's "freedom of action is curtailed to a degree associated with a formal arrest." *See Parker*, 262 F.3d at

5

419. "[T]he initial step," *Howes v. Fields*, 565 U.S. 499, 509 (2012), is to ask "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Pressley*, 990 F.3d 383, 388 (4th Cir. 2021) (quoting *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013)); *Keohane*, 516 U.S. at 112 (describing as "essential" to a custody determination the question of "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave"). But this is just the first step. *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) ("Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."). If a reasonable person would not have felt at liberty to leave, then a court must still ask "the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see also United States v. Gardner*, 823 F.3d 793, 801 (4th Cir. 2016) (rejecting custody because the questioning was not "the functional equivalent of a 'stationhouse interrogation'").

Distinguishing between these two steps helps explain why the Supreme Court and the Fourth Circuit have concluded that a person might not be free to leave but might also not be in custody under *Miranda*. For example, during a traffic stop, a driver may not be free to drive away, but such stops still do not ordinarily constitute "custody" because they are not coercive enough. *See, e.g., Berkemer*, 468 U.S. at 438 (noting that most traffic stops are not custodial because, among other things, motorists do not "feel[] completely at the mercy of police").

6

For much the same reason, a "*Terry* stop does not constitute *Miranda* custody." *Shatzer*, 559 U.S. at 113 (cleaned up) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Just like the subject of a traffic stop, the person cannot leave. But, like traffic stops, *Terry* stops lack the necessary coercion, and so do not curtail a person's freedom of action to "a degree associated with formal arrest." *See Berkemer*, 468 U.S. at 439–40. Indeed, by their very definition, *Terry* stops are not the equivalent of an arrest. *See Terry*, 392 U.S. at 24–25 (addressing what actions officers can take when they have reasonable suspicion but lack "probable cause for an arrest"); *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (explaining the line between "an investigative stop" under *Terry* and "a *de facto* arrest"). So an officer's actions that fall within the bounds of a lawful *Terry* stop do not create custody under *Miranda*: the "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Howes*, 565 U.S. at 510 (quoting *Shatzer*, 559 U.S. at 113); *see also Leshuk*, 65 F.3d at 1108–10.[5]

Leggette was not "in custody" when he admitted the weapon was his at the park. He was, of course, not free to leave. Officer Rochelle testified that Leggette was not free to leave when he discovered Leggette and Marshall trespassing in the park. Leggette's

_____

[5] This does not mean that every time an officer exceeds *Terry*'s bounds, he creates *Miranda* "custody." Of course, such an encounter might well be custodial. But we may not to convert a necessary condition into a sufficient condition. *Terry*'s Fourth Amendment analysis and *Miranda*'s Fifth Amendment analysis remain distinct inquiries, focused on different questions. The Fourth Amendment limits what actions an officer may take during a *Terry* stop to confirm or dispel their reasonable suspicion. *See United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). Yet action that exceeds these limits need not create the kind of "inherently coercive pressures" at issue in *Miranda*'s stationhouse interrogation. *See Howes*, 565 U.S. at 509.

7

inability to freely leave continued while he was frisked and questioned following the discovery of his discarded weapon. Thus, when Leggette was interrogated at the park, he "was not at liberty to terminate the interrogation and leave." *See Pressley*, 990 F.3d at 388.

But although Leggette was not free to leave, we must still ask "the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Howes,* 565 U.S. at 509. We find that these circumstances do not. Only one officer questioned Leggette. *Cf. Berkemer*, 468 U.S. at 438 (explaining that traffic stops are not custodial in part because "the detained motorist typically is confronted by only one or at most two policemen"). Officer Rochelle asked only a handful of questions, targeted at determining ownership of the weapon that had just been discovered. These questions were offered in a "polite" tone of voice. J.A. 103. Officer Rochelle never got so far as to draw his firearm, physically restrain Leggette before or during the questioning, or touch Leggette beyond the protective frisk. *Cf. Leshuk*, 65 F.3d at 1109–10 ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."). All of this happened over a short time in a public area with Marshall at Leggette's side. Taking all this together, we conclude that this was not a custodial interrogation. *See Gardner*, 823 F.3d at 801 (explaining that officers may engage in a "brief period of questioning [without the interaction turning] into the functional equivalent of a 'stationhouse interrogation' that would require *Miranda* warnings").

That the facts here closely mirror *Gardner* supports our conclusion. In *Gardner*, police pulled over the defendant, Gardner, because they suspected that he was a felon illegally in possession of a firearm. *Id.* at 798. Two officers approached Gardner's car, with one of them holding his gun at his side, and then ordered Gardner out of the car, patted him down, and asked him if "he had 'anything illegal in his car.'" *Id.* When Gardner did not respond to the query and merely "h[ung] his head," the officer asked again "[w]hat is it that is illegal in your car[?]" *Id.* It was at this point that Gardner gave an unwarned confession that he had a firearm in his car, which he was not allowed to possess. *Id.* Similarly here, two officers interacted with Leggette during an encounter in which Leggette was not free to leave. Neither officer drew the guns from their holsters.[6] And Officer Rochelle patted down Leggette and asked him about his firearm multiple times to get Leggette to admit what he at first did not. The similarities between Leggette's case and Gardner's case virtually compel a finding that, just as in *Gardner*, the interrogation here was non-custodial.

Leggette focuses on three distinctions that he believes warrant finding that the totality of the circumstances here point to a different outcome. But these distinctions, considered together alongside the totality of the circumstances, fail to show he faced a custodial interrogation in the park.

---

[6] Officer Rochelle's weapon was visible. Officer Rochelle also testified that it was "possible" that he rested his arm or hand on his gun that night. J.A. 69. But he did not know for sure. So we cannot assume that he did. *See Palmer*, 820 F.3d at 648 (asserting that evidence should be viewed "in the light most favorable to the government"). And even if Officer Rochelle did place his hand on his weapon, this would not distinguish Leggette's interrogation from Gardner's. *See Gardner*, 823 F.3d at 798.

First, Leggette argues that the questioning itself was more coercive than the questioning in *Gardner*. Officer Rochelle asked Leggette about the firearm at least three times (rather than twice in *Gardner*); the questioning continued in the face of express denials (rather than mere avoidance as in *Gardner*); and while questioning, Officer Rochelle advised Leggette that honesty would go a long way to help Leggette. Neither the number of questions nor Leggette's initial denials assist Leggette. *See Sullivan*, 138 F.3d at 129, 132 (finding continued questioning in the face of verbal rebuttals non-custodial). And an interrogation is not more coercive simply because the officer encourages the suspect's cooperation, even if the officer promises to help the suspect if they admit criminality. *See Sullivan*, 138 F.3d at 131–32; *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495–96 (1977) (explaining that confronting a defendant with false evidence that their fingerprints were found at the crime scene "has nothing to do with whether the [defendant] was in custody for purposes of the *Miranda* rule").

Second, Leggette argues that the setting added to the coercive atmosphere of the interrogation. According to Leggette, the parking lot of a dark park—while a public place—presented only limited opportunity for a passerby to witness the events. The likelihood of public witnesses lessens the coercive atmosphere of an interrogation, *see Berkemer*, 468 U.S. at 438, and it is "pertinent" to the custody determination whether the suspect was "isolate[ed] and separate[ed]" from those they know, *see Hashime*, 734 F.3d at 283. Here, although the park was dark, it was still a public area. And Leggette was not isolated or separated from his companion Marshall. So the setting of Leggette's

interrogation, while different from that in *Gardner*, does not change the overall outcome of our inquiry.

Third, Leggette argues that his interrogation was more coercive than the interrogation in *Gardner* because his interaction with the police began when Officer Rochelle confronted him for trespassing, an arrestable offense. Perhaps being detained for an arrestable offense might in some circumstance lead a reasonable person in the suspect's position "to believe he [i]s 'in custody.'" *See United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010). But the mere fact that an investigation involves a theoretically arrestable offense does not make that police interaction custodial. *See United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006) ("It is the 'compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted' that implicates *Miranda*." (quoting *Beckwith v. United States*, 425 U.S. 341, 346 (1976))).

Here, trespass was technically an arrestable offense. But not every investigation of trespass ends in arrest. And that remains true even when the investigation confirms the offense was committed. Indeed, Marshall was not arrested for trespassing. Whatever Officer Rochelle's eventual plans for Leggette, he never expressed to Leggette that he intended to arrest him. *See Berkemer*. 468 U.S. at 442 (explaining that a "policeman's unarticulated plan has no bearing" on the custody analysis). All he did was focus his investigation on Leggette. True, this was to the exclusion of investigating Marshall. But "[t]he fact that the individual is the 'focus' of an investigation is not significant to the [custody] inquiry." *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987). So even

11

when added to the broader totality analysis, the fact that Leggette could technically have been arrested for trespass before or during the interrogation does not make his questioning custodial. *See United States v. Feather*, 801 F.2d 157, 158 (4th Cir. 1986) (explaining that "focus[ing]" an investigation on a suspect that officers may have "probable cause to arrest" does not mean the suspect is "in custody").

Recall, we must assess the totality of the circumstances to determine whether Leggette's interrogation was coercive enough to render him "in custody" under *Miranda*. Doing so, and considering our finding in *Gardner* under similar circumstances, we conclude that Leggette was not in custody. Since Leggette was not in custody for his interrogation at the park, no *Miranda* warnings were required and so the district court correctly concluded that his responses to Officer Rochelle's questions should not be suppressed.[7]

*          *          *

*Miranda* warnings are not required every time an individual has their freedom of movement restrained by a police officer. *Howes*, 565 U.S. at 509. Nor are they necessarily required every time "questioning imposes some sort of pressure on suspects to confess to their crimes." *McKune v. Lile*, 536 U.S. 24, 49 (2002) (O'Connor, J., concurring in the judgment). Instead, they are required only when a suspect's freedom of movement is restrained to the point where they do not feel free to terminate the encounter *and* the

---

[7] Having determined that there was no *Miranda* violation all, we need not consider the effect a violation would have on Leggette's later Mirandized statements at the detention center.

12

circumstances reveal "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.  Here, no such pressures existed, so the district court's order is

*AFFIRMED.*