PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN ANTHONY PETERSON,

*Defendant-Appellant.*

No. 08-4889

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(4:07-cr-00045-BR-1)

Argued: September 24, 2010

Decided: January 14, 2011

Before NIEMEYER, MOTZ, and
GREGORY, Circuit Judges.

Vacated and remanded by published opinion. Judge Niemeyer
wrote the opinion, in which Judge Motz and Judge Gregory
joined.

## COUNSEL

**ARGUED**: Slade Culli Trabucco, THE TRABUCCO LAW
FIRM, PA, Raleigh, North Carolina, for Appellant. Kristine
L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY,

Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes, Jennifer P. May-Parker, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

After a jury convicted John Peterson on six counts of drug trafficking and firearms charges, the district court sentenced him to 420 months' imprisonment. In making its sentencing decision, the district court found that Peterson was a career offender under U.S.S.G. § 4B1.1(a), because he had two prior felony convictions of a crime of violence, one of which was a North Carolina conviction for involuntary manslaughter.

Peterson contends that his North Carolina manslaughter conviction was not a crime of violence, as defined in U.S.S.G. § 4B1.2(a) and that, therefore, he should not have been sentenced as a career offender.

We agree. Because Peterson's prior involuntary manslaughter conviction did not have any requirement of intent or *mens rea*, we conclude that it was not a crime of violence, as defined by U.S.S.G. § 4B1.2(a). Accordingly, we vacate Peterson's sentence and remand for resentencing.

I

A jury convicted Peterson in April 2008 of (1) conspiracy to distribute and possess with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846; (2) distribution of more than five grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1); (3) distribution of more than

50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1); (4) possession of more than 50 grams of crack cocaine and quantities of cocaine powder, marijuana, and MDMA ("Ecstasy") with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); (5) possession of firearms in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c); and (6) unlawful possession of firearms by a felon, in violation of 18 U.S.C. § 921(g)(1).

In calculating Peterson's sentencing range for counts 1 through 4 and 6, the district court found that Peterson was a career offender, based on two prior convictions, one of which was a North Carolina conviction in 2001 for involuntary manslaughter. That conviction arose from an incident in which Peterson accidentally shot his close friend, William Reid, while the two were playing with what they believed (mistakenly) was an unloaded pistol. Overruling Peterson's objection to use of this conviction, the district court determined that the Guidelines sentencing range for these counts was 360 months to life imprisonment. The sentence for Count 5 was an additional, consecutive 60 months' imprisonment.

If the North Carolina conviction had not been used as a predicate offense under U.S.S.G. § 4B1.1(a), Peterson's Guidelines range would have been 168 to 210 months' imprisonment for Counts 1 through 4 and 6 and 60 consecutive months' imprisonment for Count 5.

The district court acknowledged that use of the North Carolina involuntary manslaughter conviction presented a "close call," but the court determined that it was bound by our decision in *United States v. Payton*, 28 F.3d 17 (4th Cir. 1994), holding that a South Carolina conviction for involuntary manslaughter qualified as a predicate crime of violence under the predecessor to U.S.S.G. § 4B1.2(a).

The court sentenced Peterson to 420 months' imprisonment, which included concurrent 360-month terms of impris-

onment on Counts 1 through 4, a concurrent 120-month sentence on Count 6, and a consecutive 60-month sentence on Count 5.

This appeal followed.

## II

Peterson contends that his prior North Carolina conviction for involuntary manslaughter does not qualify as a "crime of violence," as defined by U.S.S.G. § 4B1.2(a), so as to make him a career offender under § 4B1.1(a). He argues that our 1994 decision in *Payton*, on which the district court relied, was implicitly overruled by the Supreme Court's 2008 decision in *Begay v. United States*, 553 U.S. 137, 144-45 (2008), holding that a conviction for a violent felony under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), had to involve conduct that was "purposeful, violent, and aggressive." He asserts that a North Carolina conviction for involuntary manslaughter was categorically not purposeful.

The government argues that *Payton* is still binding precedent and that *Begay* construed ACCA, not the Sentencing Guidelines, which have their own binding interpretive rubrics. Because Application Note 1 to U.S.S.G. § 4B1.2(a) includes "manslaughter" as a "crime of violence," without distinguishing voluntary from involuntary manslaughter, the government contends that Peterson's involuntary manslaughter conviction qualifies as a predicate offense, making him a career offender under U.S.S.G. § 4B1.2(a)(2).*

Because resolution of the issue involves interpretation of the Sentencing Guidelines, we begin with the text. The Guide-

---

*The government does not argue that Peterson's involuntary manslaughter conviction was a crime of violence as defined in U.S.S.G. § 4B1.2(a)(1), which must have "as an element the use, attempted use, or threatened use of physical force against the person of another."

lines provide for a sentencing enhancement if the defendant is a "career offender." U.S.S.G. § 4B1.1(a). A career offender is defined as a defendant (1) who is "at least eighteen years old at the time the defendant committed the instant offense of conviction"; (2) whose instant offense is "a felony that is either a crime of violence or a controlled substance offense"; and (3) who "has at least two prior felony convictions of either a *crime of violence* or a controlled substance offense." U.S.S.G. § 4B1.1(a) (emphasis added). The term "crime of violence" is, in turn, defined in § 4B1.2(a) as follows:

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that —
>
> (1)   has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2)   is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). Application Note 1 to § 4B1.2(a) explains:

> "Crime of violence" includes murder, *manslaughter*, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as "crimes of violence" if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (*i.e.*, expressly charged) in the count of which the defendant was convicted involved use of explosives

(including any explosive material or destructive
device) or, by its nature, presented a serious potential
risk of physical injury to another.

U.S.S.G. § 4B1.2(a) cmt. 1 (emphasis added).

It is now established that this commentary to the Sentencing Guidelines is authoritative and binding, "unless it violates the Constitution or a federal statute, or is inconsistent with, or plainly erroneous reading of" the Guideline itself. *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because we find no inconsistency here, we treat the commentary as binding. *See United States v. Seay*, 553 F.3d 732, 737 (4th Cir. 2009) (finding no inconsistency between U.S.S.G. § 4B1.2 and its commentary).

The parties' arguments suggest two ways by which a North Carolina conviction for involuntary manslaughter might be a crime of violence under U.S.S.G. § 4B1.1(a). North Carolina involuntary manslaughter might be "manslaughter" as explicitly included in § 4B1.2(a) cmt. 1, or it might be an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another" under § 4B1.2(a)(2). We address these two questions in order.

A

The first question, whether a North Carolina conviction for involuntary manslaughter is "manslaughter," raises two subsidiary questions: (1) what constitutes "manslaughter," as the term is used in the Sentencing Guidelines commentary, and (2) whether the North Carolina conviction for involuntary manslaughter qualifies as "manslaughter."

Courts employ a categorical approach in determining whether a prior conviction will lead to a sentence enhancement under the Sentencing Guidelines. *Seay*, 553 F.3d at 737 ("In determining whether a conviction qualifies as a crime of

violence under the Sentencing Guidelines, we use the 'categorical approach'"); *see also Taylor v. United States*, 495 U.S. 575, 588 (1990) ("[T]he enhancement provision always has embodied a categorical approach to the designation of predicate offenses").

As described in *Taylor*, the categorical approach involves two steps. *First*, a court must distill a "generic" definition of the predicate offense based on how the offense is defined "in the criminal codes of most states." *Taylor*, 495 U.S. at 598. The *Taylor* Court borrowed the "generic," "contemporary," and "modern" definition of burglary from the Model Penal Code and a modern criminal law textbook, which provided similar definitions. *See id.* & n.8. Pointing out the necessity of distilling the generic crime of burglary, the Court rejected simply applying a single State's form of burglary. It explained that any definition of a predicate offense that would be determined by a single State's criminal law could result in unacceptable differences in applying federal law in sentencing defendants. *Id.* at 590-91. "That would mean that a person convicted of unlawful possession of a firearm would, or would not [through an enhancement based on a single State's definition of burglary], receive a sentence enhancement based on exactly the same conduct, depending on whether the State of his prior conviction happened to call that conduct 'burglary.'" *Id.*

*Second*, after finding the generic form of the predicate offense, a court must determine whether the defendant's prior conviction constituted a conviction of the generic offense. That determination is made categorically, not by comparing the defendant's prior *conduct* with the generic offense, but rather by comparing the *elements* of the crime of conviction with the generic offense. As the *Taylor* Court admonished, the court must "look[] only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Taylor*, 495 U.S. at 600.

The categorical approach applied in this way achieves uniformity in enforcement of federal sentencing enhancements and avoids retrials of prior convictions, which would effectively result from delving into the conduct underlying a prior conviction rather than looking to the elements of the offense of the prior conviction.

We now turn to the question of what constitutes generic "manslaughter," as used in U.S.S.G. § 4B1.2(a) cmt. 1. Because a review of "manslaughter" offenses under various state criminal laws appears to yield material variations, especially when looking at relevant state laws, such as those in North Carolina (applicable here) and South Carolina (applicable in *Payton*), we conclude, as did the Supreme Court in *Taylor*, that the Model Penal Code provides the best generic, contemporary, and modern definition, particularly because it has been widely adopted. *See Taylor*, 495 U.S. at 598 n.8; *see also United States v. Velez-Alderete*, 569 F.3d 541, 544 (5th Cir. 2009); *United States v. Gonzalez-Ramirez*, 477 F.3d 310, 316 (5th Cir. 2007). The Model Penal Code defines "manslaughter" as a homicide that "is committed recklessly," or that would be murder except for the fact that it was "committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse." Model Penal Code § 210.3 (1962). In turn, it defines recklessness to mean a "conscious[] disregard[] of a substantial and unjustifiable risk that the material element will result from [the] conduct." Model Penal Code § 2.02(2)(c). Concluding the Code's definition to be a satisfactory generic definition of "manslaughter," we hold that "manslaughter" in U.S.S.G. § 4B1.2(a) cmt. 1 means a criminal homicide that is committed (1) recklessly (i.e., with a conscious disregard of risk) or (2) intentionally if committed under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse.

Against that generic definition of manslaughter, we now determine whether the elements of Peterson's prior North

Carolina conviction for involuntary manslaughter fit the generic crime of manslaughter. Under North Carolina law, involuntary manslaughter is "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Hudson*, 483 S.E.2d 436, 438 (N.C. 1997) (internal quotation marks omitted). This definition includes conduct amounting to both negligent homicide and homicide resulting from "a *thoughtless disregard* of consequences or a heedless indifference to the safety and rights of others," which North Carolina defines as "reckless." *State v. Davis*, 680 S.E.2d 239, 242 (N.C. Ct. App. 2009) (emphasis added) (quoting *State v. Weston*, 159 S.E.2d 883, 886 (N.C. 1968)).

"Thoughtless disregard," however, is less than "conscious disregard," which is the definition of recklessness under the Model Penal Code. Therefore, these alternative elements of negligence and thoughtless disregard of consequences fall short, we conclude, of the generic crime of manslaughter, which requires at least *reckless* conduct (a conscious disregard of risk). North Carolina involuntary manslaughter is not generic "manslaughter" as used in the Sentencing Guidelines. Rather, it is more like homicide "committed negligently," which the Model Penal Code defines separately as the lesser offense of "negligent homicide." Model Penal Code § 210.4.

The government's position suggests that the appellation "involuntary manslaughter" implies the existence of a class of crimes constituting "manslaughter," such that "involuntary manslaughter" is a subset of the class "manslaughter" and therefore included in the word "manslaughter" as used in § 4B1.2(a) cmt. 1. But this linguistic argument fails to account for the fact that North Carolina's definition of "involuntary manslaughter" includes elements materially different from those of "manslaughter." While North Carolina "involuntary manslaughter" might be a lesser included offense of "manslaughter," it is nonetheless a different crime with a sub-

stantially less serious degree of culpability. The distinctness is borne out by the Model Penal Code's recognition of two separate crimes—"manslaughter" and "negligent homicide." *See* Model Penal Code § 210.3 (defining "manslaughter"); *id.* § 210.4 (defining as a separate crime "negligent homicide"). Likewise, the Model Penal Code distinguishes "recklessness" from "negligence." *Compare* Model Penal Code § 2.02(2)(c) *with* § 2.02(2)(d).

The government argues nonetheless that our decision in *Payton* controls the disposition here. In *Payton* we held that a South Carolina conviction for involuntary manslaughter constituted a "crime of violence" as used in U.S.S.G. § 4B1.2(1) (1994), the predecessor to § 4B1.2(a). In reaching that conclusion, we applied a decision from the Ninth Circuit, which held that involuntary manslaughter was an offense that "'by its nature, involves a substantial risk that physical force may be used in the course of committing the offense.'" *See Payton*, 28 F.3d at 19 (quoting *United States v. Springfield*, 829 F.2d 860 (9th Cir. 1987)). The *Springfield* court concluded that a Montana conviction for involuntary manslaughter, "which 'by its nature' involves the death of another person, is highly likely to be the result of violence." *Id.* (summarizing and quoting *Springfield*, 829 F.2d at 863).

If *Payton* remains good law in light of *Begay*, it is nonetheless inapplicable here for two reasons. First, it is not clear that South Carolina's crime of involuntary manslaughter, which *Payton* considered, is similar with regard to intent to North Carolina's crime of involuntary manslaughter. As noted, North Carolina involuntary manslaughter is defined as the unintentional killing of another without malice when caused by "(1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *Hudson*, 483 S.E.2d at 438. By contrast, South Carolina involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in (1) "an unlawful activity not naturally tending to cause death or

great bodily harm," or (2) "a lawful activity with reckless disregard for the safety of others." *State v. Mekler*, 664 S.E.2d 477, 478 (S.C. 2008). Under South Carolina law, recklessness is "a state of mind in which the actor is aware of his or her conduct, yet *consciously disregards* a risk which his or her conduct is creating." *State v. Pittman*, 647 S.E.2d 144, 167 (S.C. 2007) (emphasis added). While South Carolina's recklessness requirement would appear to require a *mens rea* that comports with the Model Penal Code definition, North Carolina's culpable negligence requirement clearly does not. *See also Davis*, 680 S.E.2d 242; *State v. Brown*, 307 S.E.2d 831 (N.C. Ct. App. 1983).

Second, in finding that involuntary manslaughter under South Carolina law was a predicate offense for a Sentencing Guidelines enhancement, the *Payton* court found that conduct violating South Carolina's law carried with it "the 'risk' of physical force" because it resulted in the death of another. *See Payton*, 28 F.3d at 19. This analysis relies on the language of U.S.S.G. § 4B1.2(a)(2), which parrots the language of ACCA, as included in 18 U.S.C. § 924(e)(2)(B)(ii). While the *Payton* court concluded that this language was satisfied by conduct amounting to involuntary manslaughter because it "involves the death of another person," the Supreme Court in *Begay*, which was decided 14 years after *Payton*, rejected such an analysis. The *Begay* Court held that an offense that "involves conduct that presents a serious potential risk of physical injury to another" was limited by the nature of the example crimes (burglary, arson, extortion, and use of explosives) and therefore had to be "purposeful, violent, and aggressive." *Begay*, 553 U.S. at 144. This holding overruled at least in part the reasoning of *Payton*.

Although the language of ACCA that was considered in *Begay* is identical to the language in U.S.S.G. § 4B1.2(a)(2), the commentary to § 4B1.2(a)(2) adds to the list of example crimes listed in § 4B1.2(a)(2) an additional six crimes of violence under the Guidelines—murder, manslaughter, kidnap-

ping, aggravated assault, forcible sex offenses, and robbery. *See* U.S.S.G. § 4B1.2(a) cmt. 1. Nonetheless, when the *Begay* analysis is applied even to the enlarged list of example crimes included in the Sentencing Guidelines commentary, it does not lead to a holding different from that reached in *Begay*, as we point out below.

At bottom, under the categorical approach, a North Carolina conviction for involuntary manslaughter does not fit the generic definition of "manslaughter," as that term is used in U.S.S.G. § 4B1.2(a) cmt. 1 to enhance sentences under § 4B1.1(a).

B

Even though North Carolina's involuntary manslaughter crime does not fit the generic crime of manslaughter, as it is a crime distinct from manslaughter, it might nonetheless be argued that it is an "other" predicate offense under U.S.S.G. § 4B1.2(a)(2), which defines a crime of violence as any offense, other than the example crimes, that "otherwise involves conduct that presents a serious potential risk of physical injury to another." Because this language is identical to the ACCA language, *see* 18 U.S.C. § 924(e)(2)(B)(ii) (defining crimes that enhance sentences for firearms offenses), it is subject to the *Begay* analysis addressing the ACCA language. *See Seay*, 553 F.3d at 739 ("[W]e conclude that *Begay*'s analysis is applicable to U.S.S.G. § 4B1.2(a)(2)").

In *Begay*, the Supreme Court held that not "every crime that presents a serious potential risk of physical injury to another" constitutes a predicate offense under ACCA. *Begay*, 553 U.S. at 142 (emphasis omitted). Rather, the Court construed the serious-potential-risk-of-physical-injury language to refer only to those offenses "that are roughly similar, in kind as well as in degree of risk posed, to the examples" included in the definition of "violent felony"—namely, burglary, arson, extortion, and crimes involving the use of explo-

sives. *Id.* at 142-43. Observing that these crimes "typically involve purposeful, violent, and aggressive conduct," *id.* at 144-45, the *Begay* Court concluded that other crimes must also have those attributes to be violent felonies under ACCA.

Applying the *Begay* analysis to U.S.S.G. § 4B1.2(a) cmt. 1, which adds six crimes to the list of example crimes for Guidelines cases—murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, and robbery—we now ask whether the predicate offense under consideration is "roughly similar, in kind, as well as in degree of risk posed, to the examples." *See Begay*, 553 U.S. at 143. Just as the Supreme Court concluded from the four example crimes that a predicate crime typically must involve purposeful, violent, and aggressive content, we have little difficulty in concluding similarly, by looking at the enlarged array of example crimes, that a qualifying predicate offense under § 4B1.2(a) must also be purposeful, violent, and aggressive.

The particular requirement of a *mens rea*, which is the characteristic relevant here in considering North Carolina's involuntary manslaughter, is clearly present in the additional six example crimes. Considering the Model Penal Code's definition of the additional examples readily demonstrates this. Murder is committed purposefully, knowingly, or recklessly, Model Penal Code § 210.2(1); kidnapping must be committed purposefully, Model Penal Code § 212.1; aggravated assault is committed "purposefully, knowingly, or recklessly," Model Penal Code § 211.1(2); forcible sex offenses are generally committed purposefully or knowingly, Model Penal Code §§ 213.1, 213.2; and robbery is committed purposefully or recklessly, Model Penal Code § 222.1 note. Because recklessness under the Model Penal Code is at least a conscious disregard of risk, we conclude that a predicate offense under U.S.S.G. § 4B1.2(a)(2) must similarly have a *mens rea*.

As we have already noted, North Carolina's involuntary manslaughter crime is defined as "unintentional" and can be

committed through negligent conduct, which does not have a *mens rea*. North Carolina courts have made this clear, observing that its version of involuntary manslaughter does not include purposeful conduct. *See Brown*, 307 S.E.2d at 832. "The difference between voluntary and involuntary manslaughter is a question of intent. As it relates to involuntary manslaughter, intent is not an issue." *Id.*

While it is true that conduct leading to a North Carolina involuntary manslaughter conviction will generally be set in motion by purposeful conduct, that fact does not convert involuntary manslaughter convictions into "crimes of violence." Otherwise, the purposeful acts of drinking alcohol and driving a motor vehicle would have caused the *Begay* defendant's prior DUI arrests to qualify as predicate offenses under ACCA. *See United States v. Woods*, 576 F.3d 400, 408-09 (7th Cir. 2009). Yet the *Begay* Court held to the contrary. *Begay*'s reference to "purposeful" conduct concerned an actor's *mens rea* ("guilty mind"), not his *actus reus* ("guilty conduct"). *Cf. Begay*, 553 U.S. at 145-46. The Court explained that while "a drunk driver may very well drink on purpose . . . the conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate." *Id.* at 145. This explanation applies equally to North Carolina involuntary manslaughter.

In short, we hold that a North Carolina conviction for involuntary manslaughter does not "otherwise involve[] conduct that presents a serious potential risk of physical injury to another," as limited in U.S.S.G. § 4B1.2(a)(2) cmt. 1, with the result that Peterson's 2001 North Carolina conviction for involuntary manslaughter does not serve as a predicate crime of violence for determining whether he is a career offender under U.S.S.G. § 4B1.1(a).

We vacate Peterson's sentence and remand for resentencing.

*VACATED AND REMANDED*