**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4663

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GEOFFREY THOMAS GATTIS,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:16-cr-00106-FL-1)

Argued:  October 26, 2017                    Decided:  December 4, 2017

Before NIEMEYER, KING, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge King and Judge Floyd joined.

**ARGUED:** Jennifer Claire Leisten, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Phillip Anthony Rubin, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  John Stuart Bruce, United States Attorney, Jennifer P. May-Parker, First Assistant United States Attorney, Seth M. Wood,

Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

————————

NIEMEYER, Circuit Judge:

After Geoffrey Gattis pleaded guilty to possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), the district court sentenced him to 70 months' imprisonment, at the low end of the Sentencing Guidelines range that it had calculated. In calculating that range, the court applied an enhanced base offense level under U.S.S.G. § 2K2.1(a)(4)(A), based on its conclusion that Gattis had a previous felony conviction for a crime of violence. And it increased that level based, among other things, on its findings that the offense involved 3 to 7 firearms and that Gattis had possessed a firearm in connection with another felony offense. On appeal, Gattis challenges these Guidelines decisions. He argues that his previous North Carolina felony conviction for common law robbery does not qualify as a conviction for a "crime of violence" under the definition in U.S.S.G. § 4B1.2(a) and that the government's evidence was insufficient to support the other two enhancements.

We affirm, concluding that Gattis's North Carolina common law robbery conviction categorically qualified as a felony conviction for a crime of violence, as provided in § 2K2.1(a)(4)(A) and defined in § 4B1.2(a). We also conclude that the evidence was sufficient to support the district court's additional enhancements.

I

On January 7, 2016, a resident of Oxford, North Carolina, called the Granville County Sheriff's Department to report that his home had been burglarized. Among the items stolen were six firearms — including a 9-millimeter Glock semiautomatic handgun,

3

a .22 caliber Marlin semiautomatic long rifle, and two assault rifles — as well as several fully loaded large capacity magazines and a Kindle Fire tablet in a purple case.

A few days later, on January 11, 2016, a woman named Ms. Watson, who resided just outside Henderson, in Vance County North Carolina, filed a police report stating that on January 8 she had heard automatic weapon fire and looked out her door to see two men whom she knew — Geoffrey Gattis and Orrie Williams — shooting at a sign at the end of her dead-end street. According to a federal law enforcement agent, Watson stated that she was "very familiar" with Gattis because he stayed with her "on regular occasions" and that she was "concerned" both about the shooting as well as the fact that Gattis and Williams "were using the street as a dump site for household items and furniture."

The next day, on January 12, 2016, officers with the Henderson Police Department were conducting a driver's license checkpoint when they observed a blue sedan turn around in an apparent effort to evade the checkpoint. They stopped the vehicle — which was driven by Williams and in which Gattis was a passenger — and after an officer asked both men to step out of the car, Gattis attempted to flee on foot before struggling with the officers who apprehended him. After he was apprehended, the officers recovered a loaded 9-millimeter Glock handgun from his person — the same Glock handgun that had been stolen from the Oxford residence on January 7, five days earlier.

On January 13, 2016, the day following Gattis's arrest, police officers searched Watson's residence and property with her consent, as well as the adjoining area where she had reported seeing Gattis and Williams firing weapons. During the search, the

4

officers recovered a .22 caliber Marlin rifle, 15 fully loaded large capacity magazines, and a Kindle Fire tablet in a purple case — property matching the description of items that, among others, had been taken during the January 7 burglary in Oxford. Officers also recovered two other firearms, several other tablets and phones, a laptop, a pair of sneakers, a valuable coin collection, a sterling silver tennis bracelet, a diamond sapphire ring, and assorted papers and documents. Several of these items had been reported as stolen during the burglary of another Oxford home on November 13, 2015, and other items had been reported as stolen in Vance, Warren, and Franklin Counties.

Gattis was indicted for the possession, as a felon, of the 9-millimeter Glock handgun recovered from him during the January 12, 2016 traffic stop, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and he pleaded guilty to the charge without a plea agreement.

In preparation for sentencing, a probation officer prepared a presentence report, which noted that Gattis had a prior North Carolina felony conviction for common law robbery; that a number of state felony charges were pending against Gattis in Vance, Warren, and Franklin Counties stemming from four burglaries that had occurred between November 2015 and January 2016; and that felony charges filed in Granville County stemming from two burglaries had been dismissed. (Defense counsel later acknowledged that those charges, which stemmed from the November 13, 2015 and January 7, 2016 burglaries in Oxford, had been "dismissed in favor of federal prosecution").

Calculating Gattis's advisory sentencing range, the presentence report began with an enhanced base offense level of 22 under U.S.S.G. § 2K2.1(a)(3), which applies, *inter*

*alia*, "if (A) the offense involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine . . . and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense."  It then recommended that Gattis receive (1) a 2-level increase under § 2K2.1(b)(1)(A) on the ground that the offense involved 3 to 7 firearms; (2) a 2-level increase under § 2K2.1(b)(4)(A) on the ground that the offense involved a stolen firearm; (3) a 4-level increase under § 2K2.1(b)(6)(B) on the ground that Gattis had used or possessed a firearm or ammunition in connection with another felony offense; and (4) a 3-level reduction under § 3E1.1 for acceptance of responsibility, for a total offense level of 27.  This offense level, combined with Gattis's Criminal History Category III, yielded a recommended sentencing range of 87 to 108 months' imprisonment.

Gattis objected to several aspects of the presentence report.  With respect to the report's application of an enhanced base offense level under § 2K2.1(a)(3), he maintained that his offense did not involve a semiautomatic firearm capable of accepting a large capacity magazine and that his prior North Carolina common law robbery conviction was not a conviction for a "crime of violence."  And with respect to the additional enhancements, he challenged the report's conclusion that he was accountable for 3 to 7 firearms and that he had possessed a firearm or ammunition in connection with another felony offense.

At the sentencing hearing, the government stated that it was not prepared to offer evidence to show that Gattis's offense had involved a semiautomatic firearm capable of

6

accepting a large capacity magazine, noting that while several large capacity magazines had been recovered, no corresponding weapons had been found with them. The district court accordingly sustained Gattis's objection on that issue but rejected Gattis's argument that his prior North Carolina common law robbery conviction did not qualify as a conviction for a crime of violence under the Guidelines. Thus, the court began with an enhanced base offense level of 20 under § 2K2.1(a)(4), instead of the enhanced base offense level of 22 under § 2K2.1(a)(3) that was recommended by the presentence report. The court also overruled Gattis's objections to the two other enhancements, finding it "clear" that Gattis's offense had involved at least 3 firearms and also finding, "based on the preponderance of the evidence, including the specific items taken from the residence, that it's more likely than not that the defendant committed the offense in connection with another felony offense." Based on these rulings, Gattis's total offense level became 25, which, when combined with Criminal History Category III, resulted in an advisory sentencing range of 70 to 87 months' imprisonment. After considering the sentencing factors specified in 18 U.S.C. § 3553(a), the court imposed a term of imprisonment of 70 months.

From the district court's judgment dated October 6, 2016, Gattis filed this appeal, challenging only the district court's calculation of his advisory sentencing range.

On August 10, 2017, while this appeal was pending, the Chief of the Federal Bureau of Prisons' Designation and Sentence Computation Center sent a letter to the district court indicating that on February 16, 2017, Gattis had been sentenced in a North Carolina court to an 8-to-19-month term of imprisonment for possessing stolen property

7

and inquiring whether his federal sentence should run concurrently or consecutively with the state sentence. In response, the district court filed an amended judgment on September 5, 2017, ordering that Gattis's federal sentence run concurrently with his "imprisonment pursuant to the judgment in Franklin County."

## II

The primary issue presented is whether the district court erred by applying an enhanced base offense level of 20 under § 2K2.1(a)(4)(A) — rather than a base offense level of 14 under § 2K2.1(a)(6)(A) — based on its determination that Gattis's prior North Carolina felony conviction for common law robbery qualified as a felony conviction for a "crime of violence," as that term is defined in § 4B1.2(a). *See* U.S.S.G. § 2K2.1 cmt. n.1 (providing that, "[f]or the purposes of this guideline," the term "'crime of violence' has the meaning given . . . in § 4B1.2(a) and Application Note 1 of the Commentary to § 4B1.2").

In August 2016, the Sentencing Commission revised § 4B1.2's definition of "crime of violence," *see* U.S. Sentencing Guidelines Manual, Supp. to App. C, Amend. 798 (eff. Aug. 1, 2016), and the new definition was in effect and applied to Gattis when he was sentenced in October 2016. The new definition provides that "[t]he term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that" *either* satisfies the "force clause" (*i.e.*, "has as an element the use, attempted use, or threatened use of physical force against the person of another") *or* is included in a list of enumerated crimes. U.S.S.G. § 4B1.2(a). The

enumerated offenses are "murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, . . . arson, extortion, . . . the use or unlawful possession of [certain types of firearms or explosive material,]" and — as most relevant here — "*robbery*." *Id.* § 4B1.2(a)(2) (emphasis added). While § 4B1.2's commentary defines a few of the enumerated offenses, it leaves "robbery" undefined. *See id.* § 4B1.2 cmt. n.1.

In *United States v. Gardner*, 823 F.3d 793, 801–04 (4th Cir. 2016), we concluded that North Carolina common law robbery does not qualify as a "violent felony" *under the force clause* of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(i), which is identical to and applied the same as the force clause in § 4B1.2(a)(1), *see, e.g.*, *United States v. King*, 673 F.3d 274, 279 & n.3 (4th Cir. 2012). We explained in *Gardner* that "North Carolina common law robbery does not necessarily [require] the use, attempted use, or threatened use of 'force *capable of causing physical pain or injury to another person*,' as required by the force clause." 823 F.3d at 804 (emphasis added) (quoting *Johnson v. United States*, 559 U.S. 133, 140 (2010)). This was so because the Supreme Court of North Carolina had held that common law robbery could be committed by using a lesser degree of force — namely, force "sufficient to compel the victim to part with his property," *id.* at 803 (quoting *State v. Sawyer*, 29 S.E.2d 34, 37 (N.C. 1944)) — and the North Carolina Court of Appeals had upheld robbery convictions where, for example, the defendant had taken property by pushing the victim's hand or shoulder, *id.* at 803–04 (citing *State v. Chance*, 662 S.E.2d 405, 2008 WL 2415981, at *3–4 (N.C. Ct. App. June 17, 2008) (unpublished) and *State v. Eldridge*, 677 S.E.2d 14, 2009 WL 1525333 (N.C. Ct. App. June 2, 2009) (unpublished)).

9

Rather than relying on the force clause of § 4B1.2(a)(1), the government has argued in this case that North Carolina common law robbery qualifies as a crime of violence under the enumerated offenses clause in § 4B1.2(a)(2) because it is "robbery." Since the Guidelines do not provide a definition of robbery, the question of whether North Carolina common law robbery qualifies as the enumerated offense of "robbery" depends on "the generic, contemporary meaning" of robbery. *Taylor v. United States*, 495 U.S. 575, 598 (1990).

Relying on *Gardner*, Gattis contends that North Carolina common law robbery does not qualify as generic robbery because the North Carolina version of the offense "can be committed with only minimal force." Drawing from the Model Penal Code and its commentary, he argues that we should define generic robbery as requiring a theft from a victim who either sustains an injury or is threatened with or put in fear of *being injured*. He argues alternatively that even under the definition of robbery provided by LaFave's *Substantive Criminal Law* treatise, for a robbery to be accomplished by means of force, the offender must use at least more than the minimal force necessary to take an item from the victim's grasp. But because, according to Gattis, "the offense of North Carolina common law robbery encompasses a theft during which the offender uses only de minimis force," North Carolina's common law robbery offense is "overbroad" as compared to generic robbery and "more closely resembles the generic offense of larceny from the person."

The government, in contrast, contends that North Carolina common law robbery "fits within the generic definition of robbery" because a robbery conviction in North

Carolina requires proof that property was "taken from a person or a person's presence by means of force or putting in fear." To determine robbery's generic definition, it urges that, like other courts of appeals to have considered the issue, we should rely on LaFave's treatise, rather than the Model Penal Code. And when relying on the contemporary meaning of robbery identified by LaFave as the generic definition, the government submits, it becomes clear that North Carolina defines its common law robbery offense in a manner consistent with the generic definition.

We agree with the government that North Carolina common law robbery categorically qualifies as "robbery," as that term is used within § 4B1.2(a)(2), and therefore conclude that the district court properly applied an enhanced base offense level under U.S.S.G. § 2K2.1(a)(4)(A) when calculating Gattis's advisory sentencing range.

When comparing a potential predicate offense to an enumerated crime, we must first ascertain the "generally accepted contemporary meaning" of the enumerated crime, *Taylor*, 495 U.S. at 596, giving the offense a "uniform definition independent of the labels employed by the various States' criminal codes," *id.* at 592. While the historical meaning of the crime at common law often provides the offense's "core," it is the "contemporary usage of the term" that controls. *Id.* We thus must endeavor to determine "the generic sense in which the term is now used in the criminal codes of most States," looking to sources like LaFave's treatise and the Model Penal Code as appropriate. *Id.* at 598 & n.8; *see also United States v. Flores-Granados*, 783 F.3d 487, 490–91 (4th Cir. 2015); *United States v. Peterson*, 629 F.3d 432, 436 (4th Cir. 2011).

For determining the most widely accepted, contemporary meaning of robbery, LaFave's treatise proves to be much more helpful than the Model Penal Code. This is so because the Model Penal Code's definition of robbery — which requires proof that, "in the course of committing a theft," the defendant "inflict[ed] *serious bodily injury*," "threaten[ed] another with or purposefully put[] him in fear of immediate *serious bodily injury*," or "commit[ted] or threaten[ed] immediately to commit any felony of the first or second degree," Model Penal Code § 222.1 — has *not* been widely adopted. *See, e.g.*, Model Penal Code & Commentaries, Part II § 222.1 cmt. 3(a), at 106 (Am. Law Inst. 1980) ("Nearly all current statutes disagree with the Model Code on this point and permit a robbery prosecution on the basis of any degree of force or fear"). Thus, unlike when determining the generic definitions of other crimes, the Model Penal Code does not provide much assistance in determining robbery's generic definition, at least with respect to the minimum amount of force sufficient to commit the crime. *Cf. Peterson,* 629 F.3d at 436 (concluding with respect to manslaughter "that the Model Penal Code provides the best generic, contemporary, and modern definition, *particularly because it has been widely adopted*" (emphasis added)).

Therefore, rather than rely on the Model Penal Code's definition of robbery, we conclude, as supported by LaFave, that generic robbery is defined as the "misappropriation of property under circumstances involving [immediate] danger to the person." 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.3, at 173 (2d ed. 2003); *see also id.* § 20.3(d)(2), at 187 ("[I]t is the *immediacy* of the threats that escalates the theft from extortion to robbery" (emphasis added)); *accord United States v. Yates*, 866 F.3d

12

723, 734 (6th Cir. 2017); *United States v. House*, 825 F.3d 381, 387 (8th Cir. 2016); *United States v. Becerril-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008); *United States v. Santiesteban-Hernandez*, 469 F.3d 376, 380 (5th Cir. 2006), *abrogated on other grounds by United States v. Rodriguez*, 711 F.3d 541 (5th Cir. 2013).  And we conclude further that the "immediate danger" element in that definition is categorically satisfied by the taking of property "from a person or a person's presence by means of force or putting in fear."  *Santiesteban-Hernandez*, 469 F.3d at 380; *see also id.* at 380 & nn.5–6 (explaining that "[t]he immediate danger element . . . has been implemented by the states in two main ways," with "[t]he majority of states requir[ing] property to be taken from a person or a person's presence by means of force or putting in fear," while eleven states "define the immediate danger in terms of bodily injury").

The distinct crime of "larceny from the person" thus becomes "robbery" in the generic sense only when the offender takes property by using force or by threatening immediate physical harm.  *See* LaFave, *supra*, § 20.3(d), at 181.  With respect to threatening harm, such a threat may be express or implicit, but *it must be sufficient to induce the victim to part with the property.  See id.* § 20.3(d)(2), at 185–87.  As for the amount of force that converts the crime of larceny from the person into robbery, we find LaFave's treatise particularly instructive.  It is clear, for example, that the act of pickpocketing is larceny from the person, rather than robbery, because "[t]aking the owner's property by stealthily picking his pocket" does not involve the requisite degree of force against the owner.  LaFave, *supra*, § 20.3(d)(1), at 182.  "[B]ut if the pickpocket or his confederate *jostles* the owner, or if the owner, catching the pickpocket in the act,

13

*struggles* unsuccessfully to keep possession, the pickpocket's crime becomes robbery." *Id.* § 20.3(d)(1), at 182–83 (emphasis added).

In the same way, we can distinguish between larceny from the person by the sudden snatching of property and robbery. According to LaFave, "[t]he great weight of authority . . . supports the view that there is not sufficient force to constitute robbery when the thief snatches property from the owner's grasp *so suddenly that the owner cannot offer any resistance to the taking*." LaFave, *supra*, § 20.3(d)(1), at 181–82 (emphasis added). But "when the owner, aware of an impending snatching, resists it, or when, the thief's first attempt being ineffective to separate the owner from his property, a struggle for the property is necessary before the thief can get possession thereof, there is enough force to make the taking robbery." *Id*. § 20.3(d)(1), at 182. In other words, in a snatching case, if the defendant uses force to overcome the victim's resistance or force more than necessary to simply remove an item from the victim's grasp, then the crime constitutes generic robbery. *See id.* § 20.3(d)(1), at 182–83 nn.43–44, 48 (citing, *e.g.*, *Robinson v. State*, 692 So. 2d 883, 886 (Fla. 1997) ("[I]n order for the snatching of property from another to amount to robbery, the perpetrator must employ more than the force necessary to remove the property from the person"); *State v. Curley*, 939 P.2d 1103, 1106 (N.M. Ct. App. 1997) ("[I]t would be robbery, not larceny, if the resistance afforded is the wearing of a necklace around one's neck that is broken by the force used to remove it and the person to whom the necklace is attached is aware that it is being ripped from her neck"); *People v. Patton*, 389 N.E.2d 1174, 1175 (Ill. 1979) (purse snatching did not constitute robbery where "the purse was gone before [the victim] realized what had

14

happened," even though the defendant's act of grabbing the purse from the victim's "fingertips" had "throw[n] her arm back 'a little bit'"); *Lear v. State*, 6 P.2d 426, 427 (Ariz. 1931) (noting that while merely snatching is not a taking by force, "if there be a struggle to keep it, or any violence, or disruption, the taking is robbery" (quoting Z. Francis Wharton, *A Treatise on Criminal Law* § 1098, at 1297 (11th ed. 1912))).

When comparing this generic, contemporary meaning of robbery to North Carolina common law robbery, we find a clean match. As noted, robbery in its generic sense is the misappropriation of property under circumstances involving immediate danger to the person, and one such circumstance is when property is taken from a person or his presence by means of force or putting in fear. Tracking this generic definition, North Carolina defines robbery as the "felonious, non-consensual taking of money or personal property from the person or presence of another by means of violence or fear." *State v. Smith*, 292 S.E.2d 264, 270 (N.C. 1982); *see also State v. Robertson*, 531 S.E.2d 490, 492 (N.C. Ct. App. 2000) ("Common law robbery requires proof of four elements: (1) felonious, non-consensual taking of (2) money or other personal property (3) from the person or presence of another (4) by means of force," whether "actual or constructive"). North Carolina common law robbery is thus subsumed within — and is a categorical match with — generic robbery.

Gattis's only argument as to why North Carolina common law robbery is broader than the definition of generic robbery that we have adopted is his contention that robbery may be committed in North Carolina using less force than is necessary to commit generic robbery by force. In this regard, he points to *Gardner*, which suggested that robbery can

15

be committed in North Carolina with "even *de minimis* contact." 823 F.3d at 803. But the issue in *Gardner* was whether, under ACCA's force clause, North Carolina common law robbery necessarily involved the use, attempted use, or threatened use of "force capable of causing physical pain or injury to another person," *Johnson*, 559 U.S. at 140, and it was only in this context that we observed that North Carolina common law robbery can be committed through the use of a relatively minor degree of force — that is, an amount of force *incapable of causing physical pain or injury*. *Gardner*, 823 F.3d at 803–04. Yet, as the LaFave treatise makes clear, to commit generic robbery by taking property through the use of force, the defendant need not use a level of force capable of causing physical pain or injury to another person. Rather, it is sufficient if the defendant "jostles the owner" or uses only that force which is sufficient to overcome the victim's resistance. LaFave, *supra*, § 20.3(d)(1), at 182–83.

North Carolina case law demonstrates that North Carolina's version of common law robbery hews precisely to the same line. The Supreme Court of North Carolina has recognized that to commit a robbery through actual force (as opposed to constructive force), the defendant must use a "degree of force . . . sufficient to *compel* the victim to part with his property." *Sawyer*, 29 S.E.2d at 37 (emphasis added). The actual force used "must be of such a nature as to show that it was intended to overpower the party robbed or prevent his resisting, *and not merely to get possession of the property stolen*." *Robertson*, 531 S.E.2d at 493 (some emphasis omitted) (quoting *State v. John*, 50 N.C. 163, 169 (5 Jones) (1857)). "In short, the victim must be *induced* to part with her property as a result of the violence." *Id.*

Consistent with these principles, the North Carolina Court of Appeals has held that a "typical purse-snatching incident" — where "the only force used by [the] defendant was that sufficient to remove [a] purse from [the victim's] shoulder" — constitutes "larceny, not robbery," *Robertson*, 531 S.E.2d at 493, relying on "[t]he rule prevailing in most jurisdictions . . . that the *mere* snatching or sudden taking of property from the person of another does not *in itself* involve such force, violence, or putting in fear as will constitute robbery," *id.* (emphasis added) (quoting Peter G. Guthrie, Annotation, *Purse Snatching as Robbery or Theft*, 42 A.L.R. 3d 1381, 1383 (1972)); *see also State v. Edwards*, 646 S.E.2d 442, 2007 WL 1892498, at \*3 (N.C. Ct. App. July 3, 2007) (unpublished) (recognizing that North Carolina "courts have repeatedly held that mere purse-snatching constitutes larceny, not robbery").\*

In contrast, in *Chance* — one of the primary authorities on which Gattis relies — the North Carolina Court of Appeals affirmed the defendant's common law robbery

---

\* Ignoring the North Carolina Court of Appeals' published decision in *Robertson*, Gattis contends that *State v. Smith*, 709 S.E.2d 602, 2011 WL 532316 (N.C. Ct. App. Feb. 15, 2011) (unpublished), shows that North Carolina permits a common law robbery conviction where the defendant snatched a purse that lay on a table next to the victim. But the holding in *Smith* does not rest on the minimum degree of force necessary to commit robbery through the use of *actual* force. The defendant there had pleaded guilty to common law robbery before challenging whether there was a sufficient factual basis to support his guilty plea. In upholding the conviction, the court noted that defense counsel's statement during the plea hearing that the victim's purse had been sitting on the table beside her "merely indicates his position that actual force was not used, but does not address, or dispute, the existence of *constructive* force." *Id.* at \*2 (emphasis added). The court thus concluded that defense counsel's statement did "not raise any serious question as to whether the force element of robbery was satisfied." *Id.*

conviction based on evidence that the defendant had not only grabbed a box of cigarettes out of the victim's hand, but had also "pushed [the victim's] hand off the box . . . in order to get possession of it," emphasizing the victim's testimony that the defendant had "grabbed [the box] with one hand and pushed [her] hand with the other." 2008 WL 2415981, at *3–4. Similarly, in *State v. Harris*, 650 S.E.2d 845, 847–48 (N.C. Ct. App. 2007), the court "look[ed] to other jurisdictions for guidance" before concluding that the act of snatching a gold necklace from a victim's neck "involves sufficient actual force to constitute robbery" since "a necklace is attached to a person in such a way that it offers resistance to anyone who would try to pull it from the person's neck."

These cases highlight that Gattis is simply incorrect when he asserts that "a robbery conviction [in North Carolina] is possible even where the offender uses only the de minimis force *necessary to take an item* from the victim's possession." (Emphasis added). Instead, just like generic robbery committed through the use of force, to commit robbery by force in North Carolina, the defendant must do more than stealthily pickpocket or suddenly snatch; he must direct a degree of force towards the victim beyond the minimum necessary to remove the item from the victim's grasp.

North Carolina case law also demonstrates why Gattis's reliance on the Sixth Circuit's recent decision in *Yates* is misplaced. The *Yates* court held that an Ohio robbery statute criminalizing the commission of a theft by "us[ing] or threaten[ing] the immediate use of force against another," 866 F.3d at 727 (quoting Ohio Rev. Code Ann. § 2911.02(A)(3)), did not qualify as generic robbery because Ohio courts had recognized that "the act of forcibly removing a purse from an individual's shoulder [was] sufficient"

18

to violate the statute, *id*. at 734 (quoting *State v. Juhasz*, No. 14-1208, 2015 WL 5515826, at *2 (Ohio Ct. App. Sept. 18, 2015)). In contrast, North Carolina law is quite clear that a mere purse snatching constitutes larceny from the person and that the act only becomes robbery if a struggle between the offender and the victim ensues, *see Edwards*, 2007 WL 1892498, at *2, or if the defendant otherwise uses more than the minimum amount of force necessary to grab a purse from a person's shoulder, *see Robertson*, 531 S.E.2d at 509; *see also State v. Watson*, 196 S.E.2d 212, 213–14 (N.C. 1973) (finding that sufficient force existed to support a conviction for robbery where the defendant's act of snatching the victim's purse from her arm broke the purse's strap and dislocated the victim's arm).

In sum, we conclude that North Carolina common law robbery qualifies as "robbery," as that term is used in U.S.S.G. § 4B1.2(a)(2), and that the district court therefore properly applied an enhanced base offense level under § 2K2.1(a)(4)(A) on the ground that Gattis had a prior felony conviction for a crime of violence.

III

Gattis also challenges the 2-level enhancement based on the number of weapons involved in the offense, *see* U.S.S.G. § 2K2.1(b)(1)(A), and the 4-level enhancement based on the district court's finding that he had "used or possessed any firearm or ammunition in connection with another felony offense," *id.* § 2K2.1(b)(6)(B). He argues that "[t]he government offered insufficient evidence to show" that either enhancement applied. We disagree.

First, the district court applied a 2-level enhancement based on its finding, by a preponderance of the evidence, that Gattis's offense involved 3 to 7 firearms. This enhancement is readily supported by the evidence showing that Gattis not only had actual possession of the 9-millimeter Glock handgun that was recovered from his person during the January 12, 2016 traffic stop, but that he also had constructive possession of the three firearms that were recovered during the search of Watson's property the next day. Gattis contends that "the evidence failed to show that [he] exercised actual or constructive possession over these items, or that he even knew that they were there," asserting that because "[t]he firearms were discovered outside, near an unsecured building on Watson's land," "the area was accessible to anyone." In making this argument, however, he ignores the record evidence of his connection to the stolen property recovered from Watson's land. For example, there was evidence showing that Gattis stayed at Watson's house "on regular occasions" and that when Watson called the police on January 11 to complain that Gattis and Williams had been shooting automatic weapons at the end of her dead-end street, she had also told the police that *they were using the street as a dump site for household items and furniture.*" (Emphasis added). Moreover, the trove of stolen goods found during the January 13 search included several items matching the specific description of property that was stolen during the January 7 burglary of an Oxford home — the same burglary during which the 9-millimeter Glock handgun recovered from Gattis's person was stolen. Thus, not only was there ample evidence supporting the district court's finding that Gattis illegally possessed both the 9-millimeter Glock and the three additional firearms that were recovered from Watson's property, but some of this

20

same evidence also showed that Gattis's unlawful possession of these three additional firearms was "part of the same course of conduct or common scheme or plan" as his offense of conviction. U.S.S.G. § 1B1.3(a)(2). In short, based on the evidence before it, the district court properly applied a 2-level enhancement on the ground that Gattis's offense involved 3 to 7 firearms.

Gattis's challenge to the district court's application of the 4-level enhancement under § 2K2.1(b)(6)(B) also fails. Again, as relevant here, that enhancement applies if the defendant "used or possessed any firearm or ammunition *in connection with* another felony offense," U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added), and an application note indicates that the "in connection with" requirement is satisfied "if the firearm or ammunition facilitated, *or had the potential of facilitating*, another felony offense," *id.* cmt. n.14(A) (emphasis added). Another application note provides, as an example, that the enhancement would apply to a defendant who had found and taken a firearm "during the course of a burglary . . . even if the defendant did not engage in any other conduct with that firearm during the course of the burglary" because, in such a case, "the presence of the firearm ha[d] the potential of facilitating another felony offense." *Id.* cmt. n.14(B).

So too here. The government's evidence was sufficient to show, by a preponderance, that from at least the middle of November 2015 through Gattis's arrest on January 12, 2016, Gattis and Williams were engaged in an ongoing felony conspiracy either to commit burglary or, at minimum, to receive valuable stolen property. Specifically, in addition to the evidence just noted, the record indicates that when police searched Watson's residence and property on January 13, 2016, they recovered thousands

of dollars worth of items that had been stolen during at least six different burglaries in four different counties between November 13, 2015, and January 7, 2016. The record thus showed sufficiently both that Gattis had committed at least one other felony offense — namely, an ongoing felony conspiracy — and that he possessed a firearm "in connection" with that felony offense, as the handgun that he was carrying at the time of his January 12 arrest clearly "had the potential of facilitating" the ongoing conspiracy by serving as a potential means of protecting the stolen goods. U.S.S.G. § 2K2.1(b)(6)(B) & cmt. n.14(A).

\* \* \*

For the reasons given, we conclude that the district court properly calculated Gattis's sentencing range and accordingly affirm its judgment.

AFFIRMED